[No. 21050. Department One. April 5, 1928.]

## A. McGILL, *Appellant*, v. J. B. BAKER *et al.*, *Respondents*.[1]

[1] ASSIGNMENTS (27)—LIABILITIES TO THIRD PARTIES—ASSUMPTION OF PERFORMANCE OF CONTRACT ASSIGNED. The assignee of a contract whereby the assignor was to produce and care for and sell nursery stock, in consideration of advances and payments to be made by the owner, assumes the burden of performing the contract, where he agreed with the assignor, for the benefit of the owner, to "finance said nursery, and pay all salesmen and laborers employed," and received the money furnished by the owner constituting the consideration, in substantial part, of such covenant.

[2] ASSIGNMENTS (5) — CONTRACTS ASSIGNED — PERSONAL SERVICE. The assignee of a contract to produce nursery stock cannot claim that the contract was not assignable because it called for the personal skill of the assignor, especially where he employed the assignor to carry out the contract.

[3] EVIDENCE (64)—MATERIALITY—REMOTENESS. In an action for breach of a contract to produce nursery stock, assumed by an assignee, evidence of the value of nursery stock on another tract is too remote to indicate an assumption of the burden of the contract.

Appeal from a judgment of the superior court for Yakima county, Nichoson, J., entered February 11, 1927, dismissing an action on contract at the close of plaintiff's case. Reversed.

*Richards, Gilbert & Conklin,* for appellant.
*Grady & Velikanje,* for respondents.

TOLMAN, J.—Appellant, plaintiff below, has appealed from a judgment denying relief and dismissing his action, entered upon motion of the defendants at the close of plaintiff's testimony.

It appears that, on November 27, 1923, the appellant

[1] Reported in 266 Pac. 138.

entered into a written contract with one A. W. McDonald, wherein McDonald agreed, in consideration of certain payments to be made to him by McGill, to provide the necessary land and perform the necessary labor in planting, growing, digging and shipping certain specified quantities of nursery stock, trees and seedlings, the necessary seed and seedlings to be furnished by McGill. McDonald, after properly growing the stock, agreed to dig, prepare for shipment and ship the same to McGill, or on his order, during the shipping seasons of 1925 and 1926. The price per unit of the matured stock was fixed by a schedule attached to the contract, and McGill agreed to advance $1,000 on April 1, 1924, $2,000 on August 1, 1924, $1,000 on December 1, 1924, and the balance of the contract price, computed at the rate specified for deliveries actually made, was to be paid on June 1, 1926. Title and ownership of the stock to be at all times in McGill. McDonald assumed no liability for any shortage of production by reason of unfavorable climatic or soil conditions, shortage of water, or other causes beyond his control.

For the purpose of carrying out his contract, McDonald leased from the Yakima Indian Service a certain eighty acres of land, referred to throughout the record as the "north eighty." McGill furnished the seed and seedlings, which were duly cared for by McDonald. The advances of April, 1924, and August, 1924, were promptly paid, but the $1,000 provided by the contract to be paid on December 1, 1924, was paid only at the time and in the manner hereinafter shown. Everything proceeded apparently as contemplated until early in the year 1925, when McDonald became involved in financial difficulties. The rent on the land leased was overdue, large sums were owing for labor, and McDonald had no means to meet these demands or to proceed further. Thereupon, McGill advanced,

in the form of two checks, $800 to be used by McDonald in paying the rent due upon the eighty where McGill's stock was growing and upon another eighty controlled by McDonald, also leased in the same manner, where he was growing stock for the Oregon Nursery Company, apparently under a similar contract. At the same time, McGill also executed and delivered to McDonald two notes for $2,000 each, payable to McDonald or order, with the understanding that these notes might be discounted and the proceeds used in financing the operations, it apparently being clearly understood that these advances so made should cover the payment of December 1, 1924, and the overplus would be accounted for on final settlement.

McDonald did not pay the rent with the checks and had not disposed of the notes up until the 12th day of February, 1925, when he made an assignment of his contract to the respondents, in writing, as follows:

"The undersigned, for and in consideration of the sum of one dollar ($1.00) and other valuable considerations paid by J. B. Baker, F. P. Horschel and R. E. Richardson, does hereby sell, assign, transfer and set over unto them all right, title and interest in and to that certain contract dated November 27, 1923, between A. W. McDonald and A. McGill covering the growing, handling and selling of nursery stock at or near Satus, Washington, together with all moneys due, owing or to become due thereunder, and all rights of every kind and character growing or arising out of said contract;"

which assignment was duly acknowledged. On the same day, McDonald entered into a written contract with the respondents, by the terms of which respondents employed McDonald as operator and manager of their nursery located upon the north eighty, upon which the McGill stock was planted, and also the south eighty covered by the Oregon Nursery Company con-

tract, they agreeing to pay him a compensation of
$150 per month up to July 1, 1926, he to devote all of
his time to caring for the nursery stock and shipping
and delivering the same. The contract contains the
following provision:

"The second parties shall finance said nursery and
pay all salesmen and laborers employed, and from
time to time as second parties may designate, if there
are any net profits on hand and available and the same
are not needed for the proper prosecution and carrying
on of the nursery business, the same shall be divided
25% to the first party, and 75% to second parties."

And also:

"It is understood that the second parties have paid
the Japanese labor owing by the Yakima Produce &
Trading Company up to February 1st, 1925, in the
sum of $4,890.72, which also includes the payment of
labor to date, and have also paid the sum of $2,000, to
the creditors of said corporation, and a sum approxi-
mating $840 for rental of the above described real
estate.

"The first party does hereby agree to endorse and
transfer to second parties notes held by him in the
sum of $4,000, and checks in the sum of $800."

The oral testimony in no way contradicts any of the
matters we have set out as contained in the assign-
ment and the contract between McDonald and respond-
ents, but tends to show that the respondents proceeded
in accordance therewith, that they paid the rental on
the two eighties, running somewhere from $840 to $860,
that they paid labor claims in the amount indicated in
the contract, and perhaps other amounts to McDonald's
creditors, and that they took the $4,000 in notes and
the $800 in checks, discounting the former and cashing
the latter, and using the money so procured to reim-
burse them, so far as it would go, for the advances
already made in paying McDonald's indebtedness.

There is considerable evidence in the record indicat-

ing that McDonald had carried on his operations upon the two eighties as one, and that his liabilities could not be segregated, and that, in order to protect the north eighty upon which McGill's stock was growing, all of his indebtedness would have to be cared for. Respondents seem to have well understood, at the time of their transaction with McDonald, that the advances made by McGill were advances made under the contract, and that they must be repaid in the final settlement with McGill.

Later in the spring of 1925, it developed that the nursery stock was considerably damaged by a hailstorm and that there had been some damage from winter freezing. Efforts seem to have been made by McDonald to induce the respondents to make the necessary advances to care for the stock and minimize those damages, but apparently they were convinced that all reasonable opportunity for profit had been cut off by such damages. They declined for a time to do anything, then perhaps did a little work, but not sufficient or timely, and in the fall of 1925 ceased operations entirely and abandoned the enterprise. McGill, thereafter, to mitigate his damages, went on the place, salvaged such stock as was marketable, expending $906.35 in so doing, and salvaged stock of the value of $5,263.02, which amount he credited on his advances, and brought this action for the balance of $3,433.33, which he had advanced and which had not been in any manner repaid to him. For this amount he sues in his first cause of action, and his second cause of action is for $3,000 damages claimed by reason of loss and destruction to the nursery stock alleged to have been caused by the neglect and failure of the respondents to properly cultivate and care for the same.

[1] The action of the trial court, in entering a judgment of dismissal at the close of the plaintiff's

case, appears to be based upon the insufficiency of the evidence to show any assumption of the obligations of the contract by the respondents.

Appellant contends that, as a general proposition of law, one who takes an assignment of an executory contract, which has both benefits and burdens, must bear the burdens in order to reap the benefits. He cites numerous authorities, but the rule for which he contends is well stated in 5 Corpus Juris, 976, § 169:

"The assignment of a mere personal contract does. not give the other contracting party a right to sue the assignee for a breach thereof; and the mere assignment of an interest under a contract will not render the assignee personally liable for moneys thereafter to become due. So an assignment of money due, or to become due, under an executory contract, is not an assignment of the contract, and the assignee is not bound to perform it. But on the other hand, it is held that the assignee of a contract, who acquires the right to enforce the executory provisions thereof or to recover damages for the breach, assumes the burdens which are imposed upon the assignor by the contract as the consideration for the performance by the other party."

The theory advanced by respondents is that the contract was assigned to them as security for their advances, and that as they did not go forward and attempt to enforce any rights as against McGill, they did not become bound and might abandon the contract at their pleasure, in which event McGill would be in no worse position than as though they had never intervened.

They also cite a large number of authorities in support of their position, which are well typified by the text in 2 R. C. L. 625, which reads:

"A question has been raised as to whether the assignment of a contract operates to cast on the assignee

liabilities imposed by the contract on the assignor, and it may be stated as a general principle that the assignment does not have any such effect. It cannot shift the assignor's liabilities to the assignee, because it is a well-established rule that a party to a contract cannot relieve himself of his obligations by assigning the contract. Neither does it have the effect of creating a new liability on the part of the assignee, to the other party to the contract assigned, because the assignment does not bring them together, and consequently there cannot be the meeting of minds essential to the formation of a contract. But it is not to be inferred from this that the assignee of a contract may enforce it without the performance of the obligations which it imposes. On the contrary, he takes the right with all the burdens to which it was subject in the hands of the assignor, and if he undertakes to enforce the right by an action, he must show that the conditions have been performed either by his assignor or himself. Of course he may assume the assignor's liabilities and thus create contract relations between him and the other party."

Taking these two texts and considering them together, it is apparent that, in this case, the assignment alone did not bind the respondents to carry out the contract. They might have taken the assignment as a means of securing the repayment of their advances and stopped right there, and they would have incurred no liability. But the evidence tends rather strongly to show that they did not so stop, and that it was not the intention of either party to the assignment that they should so stop. Respondents knew that McGill had placed in McDonald's hands good commercial paper amounting to $4,800, of which only $1,000 was then due under the contract, and the remaining $3,800 was intended to be used in financing the growing of the crop in which McGill was interested and out of which, only at its maturity, could he receive back his money. They likewise knew that, if they received back their advances, it must be from the matured crop.

except as McGill's money was applied to that purpose; and if McGill's money went to pay back their advances, other moneys would have to be provided to mature the crop. With that knowledge, by solemn written covenant they assured McDonald that, if he would give them McGill's money, they would "finance said nursery and pay all salesmen and laborers employed, . . . ." McGill's money furnished the consideration, at least in substantial part, for this covenant, and it was a covenant made for his benefit.

We think, under all of the authorities, the facts as they stood at the close of appellant's evidence, warranted the inference that respondents had assumed the contract.

[2] Something was said in the argument of this case as to McDonald being a skilled nurseryman and that his skill was an element that would make this contract unassignable. We think there are two answers. (1) Appellant was the party to benefit by McDonald's skill, and he only could raise that objection; and (2) the parties to the assignment recognized the need of skill and contracted to keep McDonald on and in charge of the enterprise.

[3] Error is assigned upon the rejection of evidence of the value of the nursery stock on the south eighty under the contract with the Oregon Nursery Company. This evidence was offered as showing the values which passed to respondents by reason of their contract with McDonald and as tending to indicate an assumption of the burdens of the contract with McGill. We think it too remote, and moreover, as we have seen, the written contract is sufficient.

The judgment is reversed, and the cause remanded for further proceedings.

MITCHELL, PARKER, ASKREN, and FRENCH, JJ., concur.