THOMPSON et al., Respondents, *v.* LINCOLN NATIONAL LIFE INSURANCE CO., Appellant.

(No. 8342.)

(Submitted January 14, 1943. Decided June 11, 1943.)

[138 Pac. (2d) 951.]

522

*Messrs. Speer & Hoffman,* for Relator, submitted a brief; *Mr. Harvey B. Hoffman* argued the cause orally.

*Messrs. Murch & Wuerthner,* for Respondents, submitted a brief; *Mr. Clarence W. Murch* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Defendant appeals from a judgment entered against it on a jury verdict. There are twenty-five specifications of error, but the only one necessary to consider is whether the trial court erred in overruling defendant's motion for a directed verdict.

The plaintiffs are the administratrices of the estate of S. E. Brokaw, deceased. In *Thompson* v. *Lincoln National Life Insurance Co.,* 110 Mont. 521, 105 P. 2d 683, their amended complaint was held good as against a general and special demurrer. It sought damages for breach of a contract made by the Northern States Life Insurance Company for the sale of land to Brokaw, alleging that the defendant had assumed the vendor's obligations and liabilities under the contract but had refused performance. Plaintiffs sought and in the judgment now appealed from were awarded a verdict and judgment for $2,403.38, which had been paid by Brokaw to the vendor before the latter had become insolvent and the contract had been assigned to defendant.

The undisputed facts, as shown by the pleadings and the evidence, are that in 1926 Brokaw entered into a written contract with the Northern States Life Insurance Company for the purchase of 160 acres of land in Teton county, Montana, for $3,000, payable $500 each year from 1926 to 1931, inclusive, with interest, of which he paid $1,500 on the purchase price and $904.38 as interest and taxes before the defendant became interested in the property; that the contract was placed on public record in 1931; that at some time prior to May 23, 1933, the vendor became insolvent and that on that date its receiver, pursuant to court order, conveyed the land to defendant and assigned to it the vendor's right, title and interest under the contract without any special agreement by defendant to assume the vendor's obligations or to refund to Brokaw the money paid by him to the vendor before its insolvency; that nothing had ever been paid defendant under the contract; that on February

8, 1934, when the contract had been in default for some five years, the defendant, by registered letter from its vice president at its home office at Fort Wayne, Indiana, gave notice, received by plaintiffs on February 13th, that unless the balance of $1,745 principal and interest due under the contract should be paid on or before March 19, 1934, plaintiff's contract rights would be cancelled, all as provided by the contract; that after that time numerous letters were written plaintiffs by defendant's collection officer at Fargo, North Dakota, whose authority extended only to the making of collections and not to the making or alteration of contracts; that all the letters written before the cancellation date inquired as to plaintiffs' progress in their application for a federal loan sufficient to pay the amount due and offered to assist those efforts; that all the letters written after that date, without exception, related to a crop rental lease desired by defendant for the crop year of 1934, indicating that the land contract had been terminated; that the only objection made by plaintiffs to the lease concerned the summer-fallowing. A statement made in one of those letters, which was written on April 21st, that the lease could be cancelled if the federal loan should be completed before harvest, when the crop rent would become due, is relied on by plaintiffs as a waiver of the cancellation notice.

On June 12, 1934, defendant notified plaintiffs by letter, introduced by plaintiffs as evidence in the case, that arrangements had been made to sell the property to Jacob Luinstra, and on August 24th defendant made a written contract to sell, and on November 26, 1934, conveyed the land to Jacob Luinstra, subject to the rights of the persons then in possession thereof, for $1,600, by a deed which was recorded on September 21, 1935; that from 1926 Brokaw until his death, and thereafter the plaintiffs, were in possession of the land until Luinstra took possession in November, 1934, apparently after completing the purchase.

On September 20, 1934, plaintiffs wrote defendant, not

tendering the money, but expressing a readiness to pay; the evidence showed that they did not then have the money but had been promised it by the husband of one of the plaintiffs, who expected to get it from his wheat crop, the harvest of which had not yet been finished. The record does not show when the crop was sold or when the money was actually available, if at all. Plaintiffs wrote again on December 10th, referring to their letter of September 20th.

The amended complaint alleged that upon the assignment defendant assumed all the obligations and liabilities of the insolvent vendor. The answer denied that allegation, and admitted only that the contract was assigned to defendant. The only evidence on the point is that the assignment was as follows:

"For Value Received, the undersigned, Northern States Life Insurance Company, a corporation, of Hammond, Lake County, Indiana, acting by and through John W. Northland, its duly appointed, qualified and acting Receiver, in pursuance of a specific order of the Lake Superior Court, Room No. 2, Lake County, Indiana, made and entered April 4th, 1933, does hereby assign, transfer and set over to the Lincoln National Life Insurance Company, of Fort Wayne, Indiana, its successors and assigns, all of the right, title and interest of said Northern States Life Insurance Company, and the right, title and interest of said Receiver, in and to that certain Contract for Deed entered into by and between the Northern States Life Insurance Company and S. E. Brokaw, dated July 30, 1926, and covering real estate situated in Teton County, Montana."

The amended complaint further alleged that the defendant breached the contract by conveying to Luinstra by a deed which "did not reserve and protect the rights of the Brokaw Estate under and pursuant to said contract of sale by and between the defendant's predecessor in interest and plaintiffs' deceased." The answer denied that allegation and in paragraph VIII alleged that its contract of sale and conveyance to Luinstra was "subject to the rights of the parties then in possession, and

conveyed only the right, title and interest of the defendant,'' and that the plaintiffs were then in possession. Plaintiffs' reply affirmatively alleged that defendant contracted to sell the property to Luinstra ''as in paragraph VIII of the defendant's answer is alleged.''

Plaintiffs' contentions are (1) that defendant assumed all of the insolvent vendor's obligations and liabilities under the contract, thus subjecting itself to any remedy plaintiffs might elect for breach of contract; (2) that defendant waived the cancellation notice, thus restoring the contract to full effect; (3) that defendant breached the contract by the sale to Luinstra without reservation of plaintiffs' rights; (4) that plaintiffs' letters of September 20 and December 10, 1934, constituted tenders of the balance due; and (5) that because of defendant's refusal to convey the land it became liable to pay as damages the entire $2,040.38, paid by Brokaw to the vendor, defendant's insolvent assignor, as principal, interest and taxes, without regard to the value of the right of possession enjoyed by Brokaw and the plaintiffs for over eight years.

It should be borne in mind that defendant is not the contracting party as vendor under the land contract, had no privity therein, made no special agreement with the vendor or the vendee in connection with the assignment of the vendor's interest in the property and the contract, or otherwise, and that any liability incurred in the premises must have resulted solely from the assignment of the contract and the conveyance of the property to defendant. It should be remembered also that the vendor did not, by the assignment to defendant, seek to evade plaintiffs' right under certain circumstances to recover from it the payments theretofore made, or to enforce against it the vendee's lien therefor, or to collect from it damages for a breach; those rights had been altered, if not entirely destroyed, by the vendor's insolvency.

The assignee of an executory contract does not, merely by accepting the assignment, or by succeeding to the property

528

subject to the contract, assume the obligations imposed by the contract on the assignor. (*Lavelle* v. *Gordon*, 15 Mont. 515, 39 Pac. 740; *Apple* v. *Edwards*, 92 Mont. 524, 16 Pac. (2d) 700, 87 A. L. R. 179; 6 C. J. S. Assignments, p. 1162, sec. 107; 4 Am. Jur. 310, sec. 102.) Accordingly, neither the defendant nor Luinstra succeeded to any contractual liability of the vendor by virtue of the mere assignments or conveyances to them. Apparently the plaintiffs recognized that fact, for they pleaded affirmatively that the defendant had assumed the obligations of the vendor under the contract, which, if true, would have subjected it to an action for damages in case of breach of contract by it. (*Bach, Cory & Co., Ltd.* v. *Boston & M. Consolidated Copper & Silver Mining Co.*, 16 Mont. 467, 41 Pac. 75; *Miller* v. *Beck*, 72 Or. 140, 142 Pac. 603; *Stewart* v. *Mann*, 85 Or. 68, 165 Pac. 590, 1169.) Since they have failed to substantiate that allegation, their case has failed.

Not having assumed the vendor's obligations under the contract but merely having succeeded to the ownership of the property involved, subject to plaintiffs' rights under the contract, neither defendant nor Luinstra became a party to it so as to be liable for damages for its breach. The same is, of course, true of the plaintiffs or other successors or assignees of the purchaser. Thus it was held in *Bimrose* v. *Matthews*, 78 Wash. 32, 138 Pac. 319, that neither the assignee of the vendor nor the assignee of the vendee assumes the assignor's obligations, although each by virtue of the assignment succeeds to the assignor's rights.

An obligation arises either from the contract of the parties or by operation of law. (Sec. 7395, Rev. Codes.) In this case, since the defendant did not assume the vendor's contractual obligation, its liabilities and plaintiffs' right against it are not contractual. Hence the plaintiffs have no election of remedies against defendant as for breach of contract.

If, however, an obligation was imposed upon defendant by operation of law, and if that obligation was breached by defend-

ant, the plaintiffs may elect any remedy afforded by law for such breach.

There is no doubt that an obligation to recognize plaintiffs' ▮ equitable right resulting from the contract was imposed upon defendant by operation of law. Pomeroy's Specific Performance of Contracts, Third Edition, states the rule at section 465.1 as follows: "The doctrine is well settled that when the vendor, after entering into a contract of sale, conveys the land to a third person who has knowledge or notice of the prior agreement, * * * such grantee takes the land impressed with the trust in favor of the original vendee, and holds it as trustee for such vendee, and can be compelled at the suit of the vendee to specifically perform the agreement by conveying the land in the same manner, and to the same extent, as the vendor would have been liable to do, had he not transferred the legal title; and such grantee is the proper defendant in the suit against whom to demand the remedy of a conveyance." For statements of the rule, which seems without exception, see, also, Maupin on Marketable Title to Real Estate, Third Edition, 521, and 58 C. J. 921, sec. 86. Some of the decisions following the rule are *Boyd* v. *Brinckin,* 55 Cal. 427; *Copple* v. *Aigeltinger,* 167 Cal. 706, 140 Pac. 1073; and *Frank* v. *Stratford-Handcock,* 13 Wyo. 37, 77 Pac. 134, 67 L. R. A. 571, 110 Am. St. Rep. 963. In the latter case the agreement seems to have been an option rather than a contract of purchase and sale.

In *Irvine* v. *Hawkins,* 20 Nev. 384, 22 Pac. 240, 241, the ▮ court said, quoting from *Bruce* v. *Tilson,* 25 N. Y. 194, 197: "The distinction between an action for a specific performance in equity and a suit at law for damages, for nonperformance, is this: that in the latter, the right of action grows out of a breach of the contract, and a breach must exist before the commencement of the action, while in the former, the contract itself, and not a breach of it, gives the action."

And while in the absence of assumption of contractual liability, the contract itself gives the right of action, it does so only

by impressing upon the property a trust interest, the obligation of which is imposed upon the assignee by law, and not by the contract, to which he is not a party. On the other hand, in *Miller* v. *Beck* and in *Stewart* v. *Mann,* supra, the Oregon court held that where the intervening purchaser agreed to assume the contract, there was a "quasi privity" on his part, which made him liable for a breach of the contract itself. The Montana case of *Bach, Cory & Co., Ltd.,* v. *Boston & M. Consolidated Copper & Silver Mining Co.,* supra, is to the same effect.

It is not true, as stated in the dissent, that by the original contract "the buyer Brokaw and *his successors in interest became obligated to pay* the contract price and the taxes, and the seller and *its successors in interest became obligated* to deliver a deed" when the price was paid. It is elementary law that a contract binds no one but the contracting parties. Brokaw's successors in interest never became obligated to pay anything; neither the defendant nor its assignor could have compelled them to pay a cent. It is equally untrue that the seller's successors in interest became obligated to do anything by the mere force of the contract. Only by assuming the contract could they become obligated by it. Moreover, as hereinafter shown, it was only by succeeding to the property with notice, actual or constructive, of plaintiff's possible interest, that as to defendant the land was impressed with a trust to that extent.

The dissent perforce admits the undeniable rule that the assignment of a contract does not ordinarily operate to cast the contract liabilities upon the assignee in the absence of an assumption thereof by him. The dissent further says, what is obvious, that the assignee may assume the assignor's liabilities, that under certain circumstances and conduct the law will imply such assumption, and that he may not enforce the contract without performing its terms. But here the assignee did not assume the assignor's liabilities, it could not possibly enforce

the contract against the plaintiffs and made no attempt to do so, and no circumstance nor conduct is pointed out from which the law may imply any assumption of contractual liabilities. The fact that the defendant requested payment and gave notice of termination cannot be construed as implying an assumption of contract liability. It had succeeded to the title and to the vendor's equity in the contract, necessarily subject to plaintiffs' equity under the contract. The latter did not by its terms expire automatically upon a default in payment; if it had, it would have expired some five years before. Unless defendant was content to permit the plaintiffs to continue holding and using the land indefinitely without further payment, it necessarily had to request payment and finally to give the notice of termination necessitated by the contract upon which plaintiffs' equity depended. Neither plaintiffs' argument nor the dissenting opinion mentions any conduct on defendant's part which could have turned the latter's trustee status into a promisor's status.

In this case, the defendant not having assumed the obligation of the contract, but merely having succeeded to the vendor's right, which was to hold the title subject to the purchaser's equity under the contract, its liability is based, not on the theory that by receiving the title under those circumstances it became a party to the contract so as to incur contractual liability, but on the ground that by operation of law it became a trustee for the vendee to the extent of the latter's rights.

It has been held that such trusteeship arises by one's succeeding to the title subject to or with actual knowledge of the purchaser's rights (*Henderson* v. *Grammar,* 66 Cal. 332, 5 Pac. 488; *Cannon* v. *Handley,* 72 Cal. 133, 13 Pac. 315; *Jackson* v. *Hyde,* 91 Cal. 463, 27 Pac. 759) or by notice imputed by the purchaser's possession (*Connecticut Fire Ins. Co.* v. *Colorado Leasing, Mining & Milling Co.,* 50 Colo. 424, 116 Pac. 154, Ann. Cas. 1912C, 597), or by notice imputed by the prior

recording of the sale contract (*Irvine* v. *Hawkins,* supra), or by any other circumstance sufficient to put a prudent man upon inquiry so as to impute notice of the fact itself. (*Anthis* v. *Sandlin,* 149 Okl. 126, 299 Pac. 458.)

As noted above, plaintiffs affirmatively pleaded in their complaint that the contract was placed on record in 1931, and that the plaintiffs, as the purchaser's personal representatives, were in possession of the land until ousted thereof by Luinstra in November, 1934; and their reply admits the defendant's conveyance to the latter "as in * * * the defendant's answer is alleged," which was that the conveyance was only of defendant's right, title and interest, and subject to the rights of the parties in possession. It is apparent, therefore, that upon this record plaintiffs cannot contend that Luinstra did not succeed to the trusteeship as fully as defendant had done, or that by the conveyance to him defendant breached the obligation imposed on it by law.

From the very nature of the trust relationship, it is immaterial, and the courts have made no distinction, whether it arises from succession to the property with mere knowledge of purchaser's rights, or with an express assignment of the vendor's right to the unpaid balance of the contract purchase price. For it is clear that in any event the intervening purchaser is entitled to the vendor's entire interest in the property, and therefore to the unpaid purchase money outstanding on the prior sale. (*Witt* v. *Boothe,* 98 Kan. 554, 158 Pac. 851.) Otherwise he would get nothing by purchasing subject to the prior contract unless the original purchaser should default. It is clear, also, that since he is the one from whom the conveyance must run, and is the one entitled to the money, he is the one to whom a tender, or an offer to pay (coupled with ability to pay) should be made (*Thomas* v. *Derrick,* (Tex. Civ. App.) 207 S. W. 140; *Grand Lodge of Brotherhood of Railroad Trainmen* v. *Clark,* 189 Ind. 373, 127 N. E. 280, 18 A. L. R. 1190).

It is well settled that each succeeding trustee can be compelled

to convey the property (*Boyd* v. *Brinckin*, supra), and that upon his breach of that duty, as by his conveyance to a bona fide purchaser without notice, he becomes liable for the damage sustained (*Mercier* v. *Hemme*, 50 Cal. 606). Conversely, and accordingly, it is equally apparent that by conveying the property subject to the plaintiffs' rights, as the property was clearly conveyed to defendant by the vendor, and to Luinstra by defendant, there was no breach of either the vendor's contractual obligation (*Anthis* v. *Sandlin*, supra; *Fargo* v. *Wade*, 72 Or. 477, 142 Pac. 830, L. R. A. 1915A, 271), or the defendant's obligation imposed by law, For an essential element of the right of private property is the right to use or dispose of it in any lawful way which does not infringe the rights of others. A vendor may, of course, contract to hold the property himself during the period of sale contract; but in the absence of such agreement he may dispose of his interest in any way which will reserve the purchaser's contract rights; namely, by seeing to it that the intervening buyer takes with notice thereof, and therefore with the resulting obligation imposed by law. Thus the only statutory prohibition we have been able to find in Montana against the conveyance of real property previously contracted to be sold, is of a resale "with intent to defraud previous or subsequent purchasers." (Sec. 11412, Rev. Codes.) The contract in this case does not limit the vendor's right to assign the contract or to sell the property subject to it, but on the contrary recognizes that right by an express mention of assigns. Upon the record in this case, the conclusion is unavoidable that by its conveyance to Luinstra of only its right, title and interest, with a reservation of the rights of those in possession, and with the notice imputed by plaintiff's possession and by the prior recording of the Brokaw contract, the defendant did not contravene plaintiffs' rights, whatever they may have been; and this would be true even if defendant's obligation had been imposed by contract rather than by law.

There is no intention here to consider in his absence Lunistra's

obligation toward plaintiffs; all that is intended is to point out that the plaintiffs have not shown that by the conveyance to Luinstra the defendant committed a breach of the obligation imposed upon it by law to recognize and preserve plaintiffs' rights, if any, under the contract. On the contrary, their own record indicates that if they had really desired to complete the purchase, rather than to lay a foundation for a damage action to recover the money paid to defendant's insolvent predecessor, they could and would have done so.

Since plaintiffs' case against defendant for assumption and breach of contract has failed, it is unnecessary to consider the contention that the defendant waived the notice of termination of plaintiffs' rights under the contract or otherwise renewed or extended those rights, or the contention that the plaintiffs made an offer to pay the balance under circumstances equivalent to a tender. It is also unnecessary to consider whether as damages for a breach either of a contractual obligation or of one imposed by law, the plaintiffs are entitled to recover, in addition to the principal, also the interest and taxes paid, without a set-off for the proceeds or the value of its use where, as here, they or the purchaser had possession and use of the land during the eight year period of the contract. They rely upon section 8672, Revised Codes, which provides that the detriment caused by breach of a *contract* to convey real estate is ordinarily "*deemed* to be the price paid." In a proper case the statute would suggest a number of interesting questions. All the points mentioned in this paragraph may become material if plaintiffs should assert their claimed rights in a suit against Luinstra.

It is apparent from what has been said that the defendant's motion for a directed verdict should have been sustained. The judgment appealed from is therefore reversed and the trial court is directed to render judgment for defendant.

ASSOCIATE JUSTICES MORRIS and ANDERSON concur.

MR. JUSTICE ADAIR, dissenting:

I view the record with different glasses; I see the law in a different light than do my associates concurring above.

By written agreement made on July 30, 1926, and thereafter recorded, Northern States Life Insurance Company, seller, obligated itself to sell to S. E. Brokaw, buyer, and the latter obligated himself to purchase a quarter section of land in Teton county, Montana, owned by the seller. The agreed consideration was $3,000 payable $500 down and the balance in annual installments of $500 each payable by the first day of each November commencing in 1927.

Thus came into being a contract. By it the buyer Brokaw and his successors in interest became obligated to pay the contract price and the taxes, and the seller and its successors in interest became obligated to deliver a deed to the land when the contract price was fully paid. Under this contract the buyer Brokaw entered into possession of the land and continued therein until December, 1930, during which time he paid in principal, interest and taxes under the contract a total of $2,094.24. In December, 1940, the buyer Brokaw died, and about two years later the seller Northern States Life Insurance Company became insolvent. Thus did fate remove from the scene of action the two original contracting parties. They left behind them however the still existing and partially executed contract for deed to the quarter section of land involved.

Upon the death of the buyer Brokaw, his two surviving sisters, the plaintiffs, Mrs. May B. Thompson and Mrs. C. B. Caskey, succeeded to the buyer's interest in the contract and to his equity in the land, and they were duly appointed to administer decedent's estate. After their brother's death plaintiffs paid in interest and taxes under the contract the further sum of $307.99.

Upon the insolvency of the seller, Northern States Life Insurance Company, a receiver was appointed who assigned the seller's interest in the contract and conveyed the seller's

536

interest in the land to the defendant, the Lincoln National Life Insurance Company.

"This court has said that the position of a receiver is no better and no higher than that of an assignee; he occupies a situation not materially different from that of the insolvent prior to the appointment; he is the arm of the court to accomplish, when necessary, the distribution of the assets of the insolvent according to the rights of those entitled thereto." (*Aetna Accident & Liability Co.* v. *Miller,* 54 Mont. 377, 389, 170 Pac. 760, 763, L. R. A. 1918C, 954.)

Thus, with the original parties to the contract both out of the picture, did the contract survive with the plaintiffs standing in the shoes of their deceased brother, the buyer, and with the defendant Lincoln National Life Insurance Company standing in the shoes of the original seller. By the assignment, which the defendant accepted, was it empowered to collect all the moneys due or to become .due and to reap all the benefits that were to accrue under the contract. By the deed to the land, which the defendant accepted, was it empowered to perform and fulfill the contract obligations of the seller and to execute and deliver a proper conveyance of the land upon the payment of the balance owing on the contract.

While it is a general principle that the mere assignment of a contract does not ordinarily operate to cast upon the assignee liabilities imposed by the contract on the assignor in the absence of an assumption of such liabilities, yet the assignee may assume the assignor's liabilities and thus create obligations between him and the other party, and under certain circumstances and conduct the law will imply that the assignee has assumed the contractual obligations of the assignor. "It is not to be inferred from the rule that the assignee of a contract is not personally responsible to the other party for the obligations imposed by the contract on the assignor unless he assumes such obligations, that he may enforce the contract without the performance of the obligations which it imposes. On the contrary,

he takes the right with all the burdens to which it was subject in the hands of the assignor, and if he undertakes to enforce the right by an action, he must show that the conditions have been performed either by his assignor or by himself. The assignee is bound by the terms of the contract to the same extent as the assignor.'' (4 Am. Jur., sec. 104, pages 311, 312.)

As before stated, under the contract for deed herein the deceased buyer's obligation was *to pay,*—pay the taxes and pay the purchase price installments while the insolvent seller's obligation was *to deliver* a deed conveying good title when the price was paid.

Immediately upon receiving the assignment of contract and the deed the Lincoln National Life Insurance Company, representing and holding itself out as the owner of both the land and the contract, launched a vigorous campaign to enforce the contract and to collect from plaintiffs, as successors in interest of their deceased brother, the balance owing on the contract. A steady stream of letters commenced pouring in on plaintiffs, all written on the letterhead stationery of the Lincoln National Life Insurance Company, and purporting to have been written by various and sundry officers, department heads, agents, employees and attorneys at law of the Lincoln National. Some of these letters came from the insurance company's office at Fort Wayne, Indiana, while others came from its office at Fargo, North Dakota.

The defendant urged plaintiffs to apply for a Federal Farm Loan for the purpose of obtaining the balance owing on the contract for deed knowing that to obtain such a loan it would be necessary to hypothecate, as security, the very land involved in the contract, legal title to which was then in the defendant Lincoln National Life Insurance Company. Plaintiffs, at the insistence and under the express direction of the defendant insurance company, made application for a Federal Land Bank loan. Numerous delays, due first to one cause and then another, were encountered but the defendant was kept fully advised as

538

to plaintiffs' earnest and untiring efforts to have their application for loan approved and to raise the balance owing on the contract.

On December 17, 1933, defendant wrote Mrs. Thompson: "If your application for a Federal Land Bank loan has not yet been appraised, it is doubtful whether you will get anything done on it this winter. We have a great deal of snow here and I understand that all the land bank appraisers have been called off the job. * * * It would be well for you to write to the Federal Land Bank and urge them to make inspection of your land as the contract will have to be foreclosed unless something definite is done for payment of the delinquent amount due."

On February 8, 1934, defendant wrote and mailed a letter to S. E. Brokaw, whom it knew had then been dead for several years, notifying the deceased that unless he paid the balance due on his contract, it would be declared forfeited effective as of March 19, 1934. Of course such notice was idle and ineffective. The dead man could not pay nor act on the notice. "A dead man is not capable of any activity." (Carnahan v. Gupton, 109 Mont. 244, 258, 96 Pac. (2d) 513, 518.)

On the same date, February 8, 1934, defendant wrote a second letter, which it registered and addressed to Mrs. Thompson as administratrix of the estate of S. E. Brokaw, deceased, advising her that defendant "has elected to declare the said contract forfeited and terminated, effective as of March 19, 1934, unless on or before that date you as administrator or some other person representing the estate of said S. E. Brokaw, deceased, pay or cause to be paid to the undersigned at its home office in the city of Fort Wayne, Indiana, the sum of $1745.00 which is the amount due upon said contract.

"This action is taken by the undersigned as the owner of the said premises and the owner and holder of the contract above mentioned." (Emphasis mine.)

On March 1, 1934, Mrs. Thompson in a letter addressed to defendant at its home office in Fort Wayne, Indiana, replied:

"Rec'd your letter stating you are cancelling our contract unless paid on or before March 19, 1934.

"You are doubtless aware we are trying to get a Federal or Commissioner Loan on this land and may not get it completed by that time.

"Some people thinks it helps if the loan company write to the land bank.

"Would you be willing to cut down any on this amount? Many of the creditors are."

To declare the contract forfeited and terminated, the defendant was required to announce its election promptly and to be and remain firm about it. This it did not do. Instead it made a show of indulgence and, to induce plaintiffs to continue in their efforts to raise the money owing on the contract, the defendant held out to plaintiffs the bait that the contract would survive the threatened March 19th deadline and that the money owing under it, if thereafter forthcoming, would be accepted and applied by defendant on such contract.

Before defendant received Mrs. Thompson's above letter and on the same date thereof, to-wit: on March 1, 1934, being *three weeks after* the date of defendant's notice of the threatened forfeiture, defendant wrote Mrs. Thompson: "Some time ago you advised us that you had made application for a Federal Loan but at that time no action had been taken on the application. *Have you any further information regarding this application? If so, advise us as to whether or not the loan has been approved and for what amount.*" (Emphasis mine.)

If defendant really intended to carry out its threat to forfeit on March 19th as announced in its letter of February 8, 1934, why was it thereafter and on March 1st concerned about the Federal Loan to secure which defendant knew the land in question was to be hypothecated?

Again, a week later, on March 7, 1934, defendant wrote Mrs. Thompson from its home office:

"Our mortgage securities in Montana are under the direction

of Mr. Andrew McKay, Manager of our office in Fargo, N. Dak., and I am forwarding your letter of March 1st to him *in order that he might assist you with your loan.*

"Mr. McKay has handled a good many matters of this character and *I know will do anything within his power to be of assistance to you in your refinancing program."* (Emphasis mine.)

If the defendant really intended to forfeit the contract on March 19th, why did it on March 7th talk to Mrs. Thompson about her "refinancing program"?

On March 9, 1934, but ten days before the March 19th deadline, defendant's manager, Mr. Andrew McKay, wrote Mrs. Thompson:

"Your letter of March 1 written to the Home Office at Fort Wayne, has been referred here. *Please correspond with this office in the future regarding this loan, as it has been handled by us.*

"*You shouldn't have much difficulty in getting a loan for sufficient amount to pay our indebtedness in full.* If you have already submitted your application it is quite likely that you will get an appraisal of the land soon. *As soon as you find out the amount approved you can take it up with us, and we will be glad to cooperate with you in any way we can to enable you to refinance this loan."* (Emphasis mine.)

The "indebtedness" referred to is the contract indebtedness. It was regarding this contract indebtedness that defendant represented to plaintiffs it "will be glad to cooperate" to enable plaintiffs "to refinance this loan."

Long after the threatened March 19th deadline had passed, and on April 21, 1934, defendant wrote the plaintiff, Mrs. Thompson: *"Have you had any advice from the Federal Land Bank in Spokane in regard to your application for a loan.* If no action has yet been taken we should make arrangements for the leasing of the property this year. * * * *In the event the Federal Loan is completed before the crop is harvested the*

*lease can be cancelled.* Please let me hear from you promptly regarding this.'' (Emphasis mine.)

Here, more than a month after the threatened deadline, was the defendant still considering the contract as in full force and virtue; still willing to permit plaintiffs to mortgage the land for the purpose of obtaining a Federal Land Bank loan; still wanting to know the latest advice from the Bank on plaintiffs' application for a loan and, to encourage plaintiffs and to induce them to continue in their efforts to obtain such loan, holding out the bait for them that, ''In the event the Federal Loan is completed *before the crop is harvested* the lease can be cancelled.''

This crop, then growing on the land, being wheat; was to be harvested in the fall to be sure. Mrs. Thompson's son had planted the wheat. He put the crop in at a time plaintiffs were rightfully in possession of the land and he most certainly had the right to harvest his wheat crop, lease or no lease. Plaintiffs had no need for any lease which ''can be cancelled'' in case ''the Federal Loan is completed before the crop is harvested.'' Plaintiffs, as successors in interest and as administratrices of the deceased buyer's estate, were entitled to possession under the decedent's contract and most assuredly the proffered ''lease'' could give them no rights that they did not already possess under the contract.

The majority opinion concludes that defendant's numerous references to a crop rental lease which defendant repeatedly requested plaintiffs to sign and return but with which plaintiffs consistently refused to have anything to do, is evidence indicating that ''the land contract had been terminated.'' With this conclusion I cannot agree and I do not view this unsuccessful attempts to prevail upon the representatives of the decedent's estate to relinquish their rights under the land contract and to substitute therefor a so-called ''lease'' which would bestow on plaintiffs no rights they did not already possess as any evidence whatever of the termination of the

contract for deed. On the contrary these endeavors to obtain plaintiffs' signatures to a "lease" rather indicate to me that defendant and its legal staff appreciated the fact that the contract for deed was still very much alive and that to protect defendant against an action for breach it was deemed advisable to attempt a novation which, in law, would effect an abandonment by plaintiffs of their rights under the contract for deed.

The record indicates to me that for the purpose of encouraging plaintiffs to continue after March 19th with their efforts to obtain a Federal Land Bank loan defendant intentionally led plaintiffs to believe, and that plaintiffs did believe, that defendant would wait for the balance owing on the contract until fall when the wheat crop could be harvested, at which time plaintiffs could raise the necessary amount either from the completion of a Federal Land Bank loan, or from the marketing of the crop or from any other source and that defendant would accept the money and deliver to plaintiffs a deed for the land. On the other hand, should the balance owing on the contract be not forthcoming then, if defendant had in its possession an executed "lease" it need only say: "Presto!" and behold, the contract, with all the obligations embodied therein would disappear and vanish into thin air, *nunc pro tunc* as of March 19th, and defendant could then produce from its files the signed "lease" which it would contend evidences "that the land contract had terminated" and that in its stead there was an entirely new deal represented by the "lease." However, plaintiffs steadfastly declined to sign the proposed "lease" and they based their rights solely upon the original contract for deed which continued in effect.

"Time being of the essence, if vendor elects to enforce forfeiture he must do so promptly, and any indulgence upon his part will ordinarily be held to operate as a waiver of such right." (1 Jones, Cyclopedia of Real Property Law, section 372, page 539.)

"Waiver may be by * * * unequivocal 'acts and demeanor'

affording reasonable and proper inducement for the purchaser in reliance thereon to alter his course as to strict and punctual compliance, either in advance of or after the prescribed time. * * * The essentiality of time may be waived by consent or acquiescence of the parties; by their conduct, such as by the extension of the time for performance—since one party cannot use his own indulgence as a trap to catch the other party; by recognizing the contract as still in force, after which neither party can terminate the agreement except upon reasonable notice; * * * by vendor's request, after purchaser's default, that purchaser refund taxes paid by vendor; by suing for the purchase money." (1 Jones Cyclopedia of Real Property Law, section 373, page 540, 541.)

Clearly, by its conduct, the defendant waived the requirement that time shall be the essence of the contract and it reconsidered and abandoned, unexecuted, its threat to declare the contract forfeited as of March 19, 1934.

On June 12, 1934, the defendant wrote Mrs. Thompson: *"We have made arrangements for the sale of this property to Mr. Luinstra* and he will make his own arrangements for the summer fallowing to be done on the land this year.

"We herewith enclose a new lease, covering the 71 acres which you have seeded to wheat. Will you please sign the lease in the places marked and return to us promptly?" (Emphasis mine.)

Thus did defendant, the Lincoln National Life Insurance Company, breach the contract and repudiate its obligations to plaintiffs by conveying the land to Jacob Luinstra, thereby rendering it impossible for it to deliver deed and a good marketable title to plaintiffs. For its own wrongful conduct the defendant most certainly is answerable. It had encouraged and urged plaintiffs to continue with their efforts to raise the balance owing on the contract. It had agreed to an extension of the time of payment. It had given plaintiffs to understand that it would accept the money from them from any source up

to such time in the fall as the wheat crop could be harvested and marketed. It had no right, thereafter and before the time so agreed, to summarily "deal out" the plaintiffs to whom it was so obligated and to "take on" the stranger Luinstra to whom the defendant insurance company was not theretofore obligated in any manner.

The $2,402.23 paid by the deceased buyer and his successors under the contract gave plaintiffs rights and equities not enjoyed by the stranger Luinstra. No attempt is here made to hold the defendant insurance company answerable for any conduct or shortcomings of the insolvent seller. The seller and the buyer got along all right until the latter died. Thereafter the original seller and the plaintiffs handled their business in a satisfactory manner. It was not until the seller had become insolvent and had passed out of the picture that trouble arose. This controversy is attributable entirely to the acts and conduct of the defendant assignee, the Lincoln National Life Insurance Company, which on April 21, 1934, and long after the threatened deadline, extended plaintiff's time to pay the balance due on the contract "until the crop is harvested" in the fall. It was the defendant assignee who made the deal with Luinstra. It was the defendant assignee, *not the assignor,* who repudiated the extension of time which it had theretofore granted plaintiffs. It was defendant assignee, *not the assignor,* who openly and unconditionally refused to perform and who asserted that after March 19th there no longer existed any contract to perform. It is this conduct *of the defendant assignee* of which plaintiffs here complain and it is for the detriment occasioned by such conduct on the part of defendant assignee that it is answerable to the plaintiffs in damages.

While defendant alleged in its answer that the deed of conveyance which it executed and delivered to Luinstra "was subject to the rights of the parties then in possession, and conveyed only the right, title and interest of the defendant" yet it is quite significant that at the trial defendant wholly failed to

produce either the original deed to Luinstra or a copy thereof and there is no competent proof to establish the above allegation or to establish the true facts. It is certain that the defendant insurance company was in no position to accept $1,600 from Luinstra in August and then in the following month of September to accept from plaintiffs the balance called for by the Brokaw contract. Defendant could not convey a good marketable title to Luinstra in August and then in September convey to plaintiffs the title called for by the Brokaw contract.

Furthermore, defendant, in its letters of December 26, 1934, and of January 8, 1935, hereinafter set forth, took the position plaintiffs had no contracts; that such rights as plaintiffs theretofore had were regularly cancelled March 19, 1934, after adequate notice. In these two letters defendant refused to recognize that plaintiffs had any contract or that defendant was in any wise or manner obligated to plaintiffs, after March 19th. This doubtless was defendant's position when it delivered the deed to Luinstra, otherwise Luinstra would not have paid over the $1,600 to defendant. Such position and such conduct gave rise to this lawsuit. Defendant in its transaction with Luinstra neither protected nor recognized the rights of plaintiffs under the Brokaw contract and, in its transactions with plaintiffs defendant declined to recognize either contract rights in the plaintiffs or contract obligations on the part of defendant.

On September 20, 1934, plaintiffs wrote defendant at its home office at Fort Wayne, Indiana: "We are prepared to make final payment on land bought on contract deed from Northern States Life Insurance Co. Please send deed." The defendant did not forward the deed. It did not reply to the letter.

On December 10, 1934, Mrs. Thompson as administratrix of the Brokaw estate again wrote defendant: "I wrote you about two months ago that we were ready to make final payment on the NW¼ 32-24-3W and to please send deed but have not heard from you."

On December 26, 1934, the defendant wrote: "Dear Mrs.

Thompson: We have your letter of December 10th, and regret to say that you have delayed so long with this matter that *we are unable to reinstate the contract which was regularly cancelled many months ago* and was only cancelled after adequate notice had been given you and you failed to take any action to preserve the contract." (Emphasis mine.)

On January 8, 1935, the plaintiff Mrs. Thompson again wrote the defendant: "Your letter of Dec. 26th, states we took no action to preserve the contract after notice of cancellation was given *but we did* and was granted *until harvest to complete loan* and wrote Sept. 20 that we were ready to make final payment and to send deed. I can't understand why you were not willing to grant us the same liberal terms you were others."

On January 22, 1935, defendant replied: "We have your letter of January 8th, 1935. *You seem to be under the erroneous impression, although the contract was cancelled March 19th, 1934, that you had until Fall of 1934 to resurrect the contract. At no time did we state to you or any one else that this was the case.* We wrote letters to you and the Farm Board prior to March 19, 1934, in which we expressed the hope that you would get your loan closed prior to March 19, 1934.

"You did not get your loan in time to save your contract and it matured on March 19th, 1934. Also, we were informed by the Farm Credit Administration, Washington, D. C., that your loan was rejected. As far as we are concerned *there is nothing more to be said about the matter* and it will be unnecessary for us to answer any further letters." (Emphasis mine.)

Plaintiffs were and had been under the impression that they "had until Fall of 1934" in which to pay the balance owing on the contract and this was not an "erroneous impression." It was a true and correct impression gleaned from defendant's correspondence with and conduct toward plaintiffs. It was this very "impression" that defendant sought to, and that it did, convey to plaintiffs. On this correspondence and conduct plaintiffs relied, as was their right.

The majority opinion comments on the fact that no money was actually tendered and that plaintiffs merely wrote defendant expressing a readiness to pay. Under the circumstances above recited, the law does not require that plaintiffs make an actual tender of the money. The law says:

"Where vendor openly and unconditionally refuses to perform, the purchaser is excused from making a tender. So, where vendor's conduct amounts to an anticipatory breach of the contract, as where he disables himself from performing by conveying or encumbering the property to a third person, or where he is thrown into bankruptcy before the time for performance." (1 Jones, Cyclopedia of Real Property Law, Section 277, page 408.)

"If the vendor sells the property to a third person wrongly and not as the result of oversight or mistake, he is liable to the purchaser for the price received, even though he recaptures the title and is able to fulfill the contract. The purchaser has an absolute option to demand the proceeds or the property." (1 Jones, Cyclopedia of Real Property Law, Section 415, page 610.)

Defendant sought to avoid the waiver of the notice of forfeiture and other consequences resulting from its conduct and from its letter of April 21, 1934, to the plaintiff Mrs. Thompson, by the weak and idle contention that the writer of the letter, Mr. Andrew McKay, the manager of defendant's office in Fargo, North Dakota, had no authority to grant plaintiffs an extension of the time of payment but that his agency was limited to that only of a collection agency. The majority opinion herein refers to Manager McKay as "defendant's collection officer at Fargo, North Dakota, whose authority extended only to the making of collections and not to making or alteration of contracts." The record indicates that by its own conduct is the Lincoln National Life Insurance Company estopped to deny either the authority or the agency of its manager McKay herein. De-

fendant held Manager McKay out as its authorized agent in "handling the deal."

Mrs. Thompson's letter of March 1, 1934, *addressed to defendant at its home office* at Fort Wayne, Indiana, was *by the home office* forwarded to Mr. McKay for reply. *The home office* by its letter to Mrs. Thompson of March 7, 1934, and Mr. McKay by his letter to Mrs. Thompson of March 9, 1934, both advised Mrs. Thompson that Mr. McKay was handling the deal and that he was the proper person with whom to correspond "in the future regarding this loan." On March 9, 1934, Mr. McKay wrote: "Your letter of March 1, written to the home office at Fort Wayne, has been referred here. Please correspond with this office in the future regarding this loan, as it has been handled by us." Certainly by such conduct is the defendant estopped from denying either the authority or the agency of its manager, Mr. Andrew McKay of the Fargo office.

Plaintiffs were agreeable to and would have paid the defendant the sum of $1,725 and interest thereon from March 19, 1934, being the balance owing on the contract, and also the delinquent taxes amounting to $119.64, making a total of approximately $1,900, had defendant waited till the fall harvest. The defendant, however, apparently, was agreeable to dealing with the first stranger who came along and, on August 24, 1934, it gave Luinstra a contract to purchase the property for $1,600, being at least $300 less than defendant and its policy holders would have received had it kept faith with plaintiffs and waited but a few days for the wheat crop to be harvested and sold.

The defendant failed in its obligation to plaintiffs. For the detriment thereby occasioned the defendant is answerable. The measure of damages is prescribed in section 8672, Revised Codes of Montana, which provides: "The detriment caused by the breach of an agreement to convey an estate in real property is deemed to be the price paid, * * * with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be

conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land.''

The majority opinion contains a number of citations having to do with specific performance. This is not such an action and such authorities are foreign to the issues here involved. While plaintiffs could have sued for specific performance they did not do so. Instead they elected to sue for damages for breach of contract as was their right.

The majority opinion states that the contract for deed was assigned to defendant ''without any special agreement by defendant to assume the vendor's obligation'' thereunder. What of it? Why should there be ''any special agreement * * * to assume the vendor's obligations'' when the law itself imposes upon the assignee who seeks to enforce such a contract the obligations thereof. *Qui sentit commodum sentire debet et onus.* ''He who secures the benefit ought to assume the burden.'' This ancient maxim of the law has been incorporated into the codes of our state by legislative enactment. Section 9068, Revised Codes, provides: ''In the case of an assignment of a thing in action, the action by the assignee is without prejudice to any set-off or other defense existing at the time of, or before, notice of the assignment * * *.'' An exception to this rule is made in the case of negotiable instruments as the statute provides: ''* * * but this section does not apply to a negotiable promissory note or bill of exchange, transferred in good faith and upon good consideration, before maturity.''

''A thing in action is a right to recover money or other personal property by a judicial proceeding.'' (Sec. 6804, Rev. Codes.) The contract for deed so assigned to defendant is a thing in action and under the law, (sec. 9068, supra), the assignee took same subject to all the equities to which it was liable in the hands of the seller or its receiver. In other words, when one voluntarily accepts anything which he knows to be subject to a duty or charge, it is only rational to conclude that he means to take such duty or charge upon himself and the law

may imply a promise to perform what he has so voluntarily taken upon himself. Thus it is well settled that where, as here, the assignee claims the fruits of the contract he will be held to have impliedly assumed its burdens. (*Corvallis & A. R. R. Co.* v. *Portland E. & E. R. Co.*, 84 Or. 524, 163 Pac. 1173; *McGill* v. *Baker*, 147 Wash. 394, 266 Pac. 138; *Atlantic & N. C. R. Co.* v. *Atlantic & N. C. Co.*, 147 N. C. 368, 61 S. E. 185, 23 L. R. A., (n. s.) 223, 125 Am. St. Rep. 550, 15 Ann. Cas. 363; *Imperial Refining Co.* v. *Kanotex Refining Co.*, 8 Cir., 29 Fed. (2d) 193. Compare *Bach, Cory & Co.* v. *Boston & M. Consolidated Copper & Silver Min. Co.*, 16 Mont. 467, 41 Pac. 75.) "The assignment by the vendor usually carries with it the obligation of assignor to the purchaser." (8 Thompson on Real Property, Perm. Ed., sec. 4568, page 502.)

No prejudicial error appears in the record. The defendant refused to perform its obligation to plaintiffs. Thereby plaintiffs suffered detriment. The judgment of the district court awarding damages to plaintiffs appears to be warranted by the facts and the law and I think it should be affirmed.

MR. JUSTICE ERICKSON concurs in the above dissenting opinion of MR. JUSTICE ADAIR.

Rehearing denied June 25, 1943.