Theodore G. SENN et al., Respondents,

v.

MANCHESTER BANK OF ST. LOUIS, a corporation, Appellant.

No. 59652.

Supreme Court of Missouri,
En Banc.

June 19, 1979.

Rehearing Denied July 17, 1979.

William G. Guerri, Edwin D. Akers, Jr., W. Stanley Walch, Charles A. Newman, St. Louis, Cullen Coil, Jefferson City, for appellant.

Robert L. Sweney, Thomas C. Walsh, Mark B. Hillis, St. Louis, for amicus curiae.

Burton H. Shostak, Edward F. O'Herin, Ilona S. Leavitt, St. Louis, for respondent.

Lawrence J. Fleming, St. Louis, for intervenor-respondent.

PER CURIAM.

Manchester Bank (hereinafter bank or defendant) appeals from a judgment in favor of plaintiffs-respondents in the sum of $491,892 actual and $737,838 punitive damages. The suit was tried without a jury as a class action under Rule 52.08(b)(3). Jurisdiction is in this Court pursuant to the Missouri Constitution, art. V, § 3 (1970, amended effective January 2, 1979), because the cause involves a construction of art. I, §§ 2 and 10, and art. V, § 5 thereof. The case was briefed and argued, and an earlier opinion failing of adoption by a majority of the judges voting, the submission was set aside and the cause redocketed for the September 1978 term at which time it was again argued. The Missouri Bankers Association requested and was granted leave to appear as amicus curiae and its interests in this cause appear to be similar to those of the defendant-bank.

North American Developers, Inc., (hereinafter North American) was a Missouri corporation which owned approximately 1100 lots in Jefferson County, Missouri. Early in 1966 North American began selling these unimproved lots to the public as part of a project known as Monaco Lake. At this time only two plats—sections 1 and 3—containing about 265 lots were platted and recorded. All lots involved in this case were in sections 1 or 3. The purchasers took unrecorded contracts for warranty deeds in return for a cash down payment and a negotiable installment note for the balance. The contracts and notes were identical in form and content except as to

the description of the property, amounts, dates, and names of purchasers.

North American's existence as a developer was short-lived. Less than a year after it began selling Monaco Lake lots in quantity, it was in financial difficulty. In March of 1967 the first mechanic's lien was filed against the development and by the end of September 1967 eleven liens had been filed aggregating $85,823.32. By the end of 1967 North American had ceased operations and the people who had bought lots at Monaco Lake were left with a functionally useless development and a tangle of lawsuits.

On April 27, 1966, Manchester Bank signed a note purchase agreement with North American. Defendant agreed to purchase the notes signed by the purchasers of lots in the Monaco Lake project. The notes were to be purchased for 87½% of the principal due on each note at the time of purchase by the defendant. Of the remaining 12½%, 2½% was retained by defendant as a discount charge and 10% was a dealer reserve against bad debts. The note purchase agreement also required North American to deliver a deed of trust executed on April 27, 1966, which was to constitute a first lien on the Monaco Lake subdivision for the purpose of insuring North American's obligations under the agreement. North American was also required to deliver along with each endorsed note an executed warranty deed in blank containing a legal description of the lot which was to be delivered to the lot purchaser on full payment of the note. In conjunction with the delivery of the deed, the defendant was to release the lot from its deed of trust covering Monaco Lake.

The defendant began purchasing the notes described above about April 29, 1966, and continued to purchase them until about November 16, 1966. After purchase of a note, the defendant would sent a letter to the maker of the note (the lot purchaser) informing the maker that it had purchased the *contract* (not just the note) and that payments were thereafter to be made to defendant.

Prior to September 15, 1970, upon receipt of final payment, the defendant sent each lot purchaser a form letter transmitting their canceled note and a warranty deed. Simultaneously, a partial deed of release releasing the purchaser's lot from the defendant's deed of trust was executed and recorded by the bank. The transmittal letter recommended that the lot purchaser record the warranty deed in Jefferson County.

On approximately June 12, 1967, an agent of defendant wrote to North American advising it of its breach of the note purchase agreement. The letter cited the failure of North American to maintain clear title to the property by subjecting it to other deeds of trust and by allowing mechanics' liens to be filed against the property. The defendant then demanded that North American repurchase the notes held by the defendant in the full amount of the unpaid principal balance ($199,462.40) as per the note purchase agreement. North American was given until June 23, 1967, to comply before the defendant took appropriate steps to enforce its position.

The lienholders grew impatient and on October 13, 1967, Highland Gardens Nursery, Inc., filed an equitable mechanic's lien proceeding in which it joined all the other lien claimants, North American, defendant-bank, and others. Highland Gardens did not join any of 24 owners who had deeds from North American to a number of lots in the subdivision which had been recorded before the suit was filed, nor did it join any of the lot purchasers with unrecorded contracts for deed. None of these persons moved to intervene in the Highland Gardens suit, nor were they joined by defendant-bank, North American, or any other party in the Highland Gardens suit. This resulted from the fact that defendant did not give notice to the lot purchasers of the filing of the Highland Gardens and other mechanic's lien suits or of any other liens, such as the Kaiser deeds of trust (apparently Kaiser was the owner and holder of notes secured by deeds of trust recorded in 1967 on all or part of the Monaco Lake property, and these were later assigned to one Don Roth). There was evidence that several of

the lot owners knew of the existence of the mechanics' liens.

The trial of the Highland Gardens suit commenced on August 26, 1968, and the cause was taken as submitted on August 29. On the 28th of August, defendant filed a "Supplemental Prayer of Defendants Manchester Bank of St. Louis and Elmer J. Nonnenkamp to Petitions and Cross-Claims of Various Mechanics Liens Claimants." This "motion,' sought to have excluded from the court's judgment lots conveyed of record to third persons prior to the filing of the notice of liens. It also sought to have the mechanics' liens satisfied first out of assets other than the lots where the purchasers held unrecorded contracts for deeds. Additionally, defendant and Elmer J. Nonnenkamp filed a motion at the close of the evidence to dismiss the lienholders' claims for failure to join necessary parties as required by § 429.280(1), RSMo 1959, or in the alternative to continue the action and order joinder of all necessary parties. Mr. Nonnenkamp was an officer of defendant and the trustee named in the deed of trust executed by North American in favor of defendant. Section 429.280 requires joinder in equitable mechanic's lien proceedings of all persons whose interest in the real estate is disclosed by the public record and § 429.-190 permits others interested in the controversy or property charged with the lien to be made parties.

In December of 1969 judgment was entered in the Highland Gardens suit. Five mechanics' liens aggregating $54,956.13, plus interest, were allowed against sections 1 and 3 of Monaco Lake. Other liens were allowed against adjoining property. It was ordered that sections 1 and 3 be sold and that the proceeds, after expenses, be paid to the claimants in order of their priority. The lienholders were found to have first priority, the defendant second, and other deeds of trust third. A number of lots were exempted from the sale including those owned by owners of record mentioned above and in addition nine lots, seven of which were owned at the time by appellant Manchester Bank and two by individual owners. However, none of the deeds to exempted lots was recorded prior to the attachment of mechanics' liens under the "first spade" rule.

While the court in Highland Gardens was considering various posttrial motions, one of the judgment creditors enforced its judgment by having Monaco Lake real estate, including sections 1 and 3 sold at execution sale. This sale grew out of a judgment taken against North American in December 1967, in a case styled, "C. E. Smith, d/b/a Redeye Sling & Cable Company v. North American Developers, Inc., No. 38,151, in the Circuit Court of Jefferson County." Exempted from this sale were all those lots exempted in Highland Gardens suit plus 11 additional lots in the subdivision.

Shortly after this execution sale, on September 15, 1970, defendant, on advice of counsel, recorded 39 of the warranty deeds that it had received in conjunction with the note purchase agreement. These deeds were in the names of various members of the classes represented by plaintiffs who had unrecorded contracts for deeds and whose notes had less than one year remaining until maturity.

In December of 1972 Bloomsdale Excavating Company, a lien claimant in the Highland Gardens case, filed for execution on Monaco Lake. The subdivision, except for the exempted lots, was sold at public sale. The sheriff's report on the sale upon special execution was filed and the Circuit Court of Jefferson County ordered distribution of the proceeds as provided in the report on February 26, 1973.

On February 5, 1973, prior to the order of distribution, defendant wrote the sheriff of Jefferson County and informed him that it asserted no claim to the proceeds of the sale as it had sustained no loss with respect to the installment notes purchased from North American.

On March 8, 1974, six named plaintiffs brought this suit as representatives of a class against Manchester Bank. The class of plaintiffs were those persons who signed contracts for deeds and installment notes in 1966 and thereafter with North American

as part of the purchase of lots in the Monaco Lake subdivision and whose notes were later purchased by defendant. The class includes approximately 80 persons who purchased approximately 98 lots. Sixty-seven of the class members paid their notes in full while the remaining defaulted.

The facts outlined above are not complete and will be supplemented throughout this opinion as deemed necessary. However, they do represent the core upon which this suit is based and are for the most part undisputed.

Appellate review of a court-tried case is governed by Rule 73.01 which was construed by this court in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976): "[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it was 'against the weight of the evidence' with caution and with firm belief that the decree or judgment is wrong."

The gravamen of plaintiffs' claim is that a fiduciary relationship existed between the defendant and plaintiffs and that defendant fraudulently breached this duty causing plaintiffs to sustain a loss. The fiduciary relationship is said to have existed because defendant held the notes which obligated plaintiffs to pay for the land and because defendant held the executed warranty deeds which were to give plaintiffs record ownership of the lots. The breach of the duty allegedly occurred when the defendant failed to protect plaintiffs' interest or to give plaintiffs notice that it would not protect their interests against the mechanic's liens and other interests which had claims against the property.

Defendant contends that its relationship with the plaintiffs was that of debtor-creditor and that it would have been entitled to enforce the notes as a holder in due course.

Section 400.3–302, RSMo 1969, provides:

"(1) A holder in due course is a holder who takes the instrument
 (a) for value; and
 (b) in good faith; and
 (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
(2) A payee may be a holder in due course.
(3) A holder does not become a holder in due course of an instrument:
 (a) by purchase of it at judicial sale or by taking it under legal process; or
 (b) by acquiring it in taking over an estate; or
 (c) by purchasing it as part of a bulk transaction not in regular course of business of the transferor.
(4) A purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased."

Plaintiffs do not contend that defendant was not a holder in due course because it did not meet the requirements of § 400.3–302. Plaintiffs assert that because defendant could, on default, retain amounts paid on the note, insert its name on the warranty deeds as owner of the land, and obtain a deficiency judgment, that its position was different from that of a holder in due course.

■ Plaintiffs assert that a holder in due course is entitled to a money judgment only on default. This is not so. In the normal case, there is nothing to prevent the payee who is also the seller or vendor from taking a security interest in the property sold and transferring both the note and the security interest (mortgage) in the property to a third person as a holder in due course. On default, the holder can proceed against the property rather than seek a money judgment. Such was the situation in *Gale and Company v. Medley*, 289 S.W.2d 460 (Mo. App.1956). (Where consumer goods are involved, §§ 408.400–.415, RSMo Supp.1975, makes the holder subject to defenses good against the seller or lessor.)

It is not disputed that the defendant had the power to collect on the notes or foreclose on the property should any plaintiff default on the note. However, plaintiffs assert more than a debtor-creditor or holder-in-due-course relationship was involved. Plaintiffs cite the case of *Commerce Trust Co. v. Denson*, 437 S.W.2d 94 (Mo.App.1968), in which the defendant purchased an automobile and financed it by signing a chattel mortgage and a note. The price included a finance charge and an insurance premium for collision coverage for twelve months. The note and chattel mortgage were assigned to the plaintiff the same day the automobile was sold. Shortly after the purchase, defendant received a six-month insurance policy. Several months later, he received a letter from the insurance carrier that it would not renew the policy. Defendant did nothing and shortly after the policy expired he was involved in an accident. The defendant refused to make further payments on the note and left the car in a garage with a $612 repair bill. Plaintiff sold the automobile and then sued defendant for the damages it had sustained.

In *Commerce Trust* the court held, 437 S.W.2d at 96: " 'It is a well-established rule of law that knowledge that negotiable paper was given in consideration of an executory agreement of the payee, which has not been performed, will not deprive the indorsee of the character of a bona fide holder, unless he also has knowledge of the breach of the agreement . . .' This principle is now codified by Section 400.3–304(4)(b) of the Uniform Commercial Code." The court found this rule inapplicable, however, because plaintiff "made itself a part of the original contract by assuming the obligation to provide the desired insurance. By this action plaintiff made it obvious it had notice the payee . . . had failed to perform the agreement and had no intention of so doing, because plaintiff took over this obligation." *Id.* at 97.

*Commerce Trust* did not go so far as to say that the bank had a contractual obligation to obtain the insurance coverage. Indeed, the bank asserted that as an agent for a disclosed principal it could not be liable on the contract. The court found that by taking the note and chattel mortgage the bank knew the payee was not going to perform. This knowledge was sufficient to destroy the bank's holder-in-due-course status.

In order to analyze this case in the light of *Commerce Trust*, it is first necessary to look at the terms of the original note and contract for deed to see what North American was obligated to do and then determine if defendant knew that it would not fulfill its obligations at the time of the note purchase agreement, or if it actually assumed the duties of North American, or if defendant knew North American could not perform unless defendant partially released a deed of trust it had on all the property to secure North American's performance of its obligation under the contract with defendant.

By the terms of the contract for warranty deed, North American agreed to "deliver to the Buyers a good and sufficient Warranty Deed conveying said property to the buyers." As the note and contract for deed were executed concurrently, both must be considered together. *Commerce Trust.* Defendant, then, is charged with notice of this duty or obligation on the part of North American. It is plaintiffs' contention that defendant expressly undertook to fulfill North American's obligation to convey good and marketable title to the lot purchasers. Unlike *Commerce Trust*, plaintiffs here seek to hold defendant, the assignee of their notes, liable for a breach of duty. They are not attempting to assert a defense in an action by an assignee for the balance due on a note. Thus, it is necessary that plaintiffs prove more than a lack of holder-in-due-course status.

Plaintiffs' theory that an express assumption of North American's duties was created by the note purchase agreement and deed of trust signed contemporaneously is untenable. The evidence does not support this conclusion. The documents are devoid of any words which could properly create an express assumption of obligations under the contracts for deed.

It is the general rule that a mere assignment of rights under an executory contract does not cast upon the assignee any of the personal liabilities imposed by the contract upon the assignor. *Daniels v. Parker*, 209 Or. 419, 306 P.2d 735 (1957). However, under certain circumstances, an assignee has been held to have impliedly assumed the contractual obligation of the assignor. 6 Am.Jur.2d, *Assignments* § 109, at 292 (1963).

Those cases holding that an assignee impliedly assumes the obligations of a contract assigned have generally involved the assignment of a going business. *See Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521 (1973), and *Walker v. Phillips*, 205 Cal.App.2d 26, 22 Cal.Rptr. 727 (1962). But this is not always necessary. *See McGill v. Baker*, 147 Wash. 394, 266 P. 138 (1928). As stated in *Walker v. Phillips*, 22 Cal.Rptr. at 731: "Whether an assignee has assumed the obligations of the contract is to be determined by the intent of the parties and may be implied from acceptance of benefits under the contract."

Why would defendant want to hold the executed warranty deeds as security against the purchaser and the deed of trust as security against North American? Obviously, defendant had a substantial interest in the continuing performance by North American of the obligation to make the notes and contracts for deed available for its purchase which it felt necessitated such protection. This interest was greater than that normally associated with a holder in due course or a buyer of an installment note. An examination of the note purchase agreement and deed of trust sheds some light on the extent of the defendant's interest in this entire development.

The note purchase agreement required North American to show to defendant's satisfaction that it held good and sufficient title "or in lieu of merchantable title a Mortgagee's Title Insurance Policy . . insuring said Bank against loss by reason of title defects." This was a curious provision for the defendant to include if, as it states, it was merely a holder in due course of

separate notes of purchasers of contracts for deed and was entitled to payments on the notes despite the failure of North American's title.

Also of interest are the following provisions taken from the note purchase agreement:

"Bank agrees to release the common ground as shown on the map of the Subdivision heretofore given to Bank by the Developer from the lien of such First Deed of Trust upon the completion of and payment for the two dams which Developer is constructing in connection with the Subdivision. Said dams are to be completed in substantial compliance with the preliminary plans delivered to Bank, and Bank may require such reasonable proof of said completion and payment as it deems necessary before it shall be obligated to release said common ground, including, but not necessarily limited to, an architect's certificate of completion and certificates of payment and/or mechanic's lien waivers from the contractor and all sub-contractors working on said dams. Individual lots will be released from said First Deed of Trust as hereinafter provided.

"(3) All of said notes will be indorsed by the Developer with full recourse, and a copy of all purchase contracts executed in connection therewith will be delivered to the Bank. At the time of the indorsement and delivery of each note to Bank, the Developer will also cause an executed warranty deed in blank and in its usual form and containing an adequate legal description of the lots purchased by the maker(s) of each note to be delivered to the Bank or to a nominee designated by the Bank. Said warranty deeds will be accompanied by sufficient revenue stamps to cover the costs of transfer taxes, or in lieu thereof Bank and Developer may make other arrangements to purchase said revenue stamps. Upon payment in full of the interest and principal due on any given note, Bank or its nominee will release of record from its First Deed of Trust covering Monaco Lake Resort Subdivision the lot(s) purchased by the maker(s) of said note, and Bank or its nominee will

insert in the deed the name of the purchaser or of such other person as the purchaser may instruct in writing and deliver the same to or at the direction of the purchaser. In the event any purchaser defaults in the payment of any note and said note is or can not be charged to the Differential Account mentioned herein or is not repurchased by the Developer as provided herein for any reason, the Bank or its nominee may and is hereby authorized, at Bank's option, to declare the purchaser's interest in the lot(s) forfeited pursuant to the terms of the purchase contract and may insert the Bank's or its nominee's name in the foregoing warranty deed, whereupon the Bank or its nominee shall become the owner of said lot(s) for the purpose of satisfying Bank's loss on the note."

■ It is evident that the defendant's interest in Monaco Lake went beyond the mere collection on notes. By the terms of the note purchase agreement, defendant assumed the affirmative obligation of delivering the deeds to the lot purchasers. It also received the benefit, given to North American by the contract for warranty deed, of retaining payments made and voiding the contract by entering its name on the executed warranty deed on a lot purchaser's default. Unlike a deed of trust where the obligor *owns* the property and the deed of trust represents a security interest, here the purchaser did not own legal title to the lots, North American did, but the bank held the property itself—the warranty deed—and had the power to convey it to itself or anyone else.

The terms of the deed of trust are also of interest:

"In Trust, However, for the purpose of ensuring performance by the Developer of its obligations under said Note Purchase Agreement, including but not limited to:

(1) Developer's liability as an indorser with full recourse of all notes purchased by Bank pursuant to said Note Purchase Agreement;

(2) Developer's obligation to pay on demand, all of the Bank's expenses in investigating, handling, processing, recording or otherwise attending to any releases from the lien being created hereby, as shall be requested by the Bank pursuant to any provisions of said Note Purchase Agreement under circumstances in which the Differential Account described in said Note Purchase Agreement shall become insufficient to reimburse the Bank for such expenses or charges as therein detailed;

(3) Developer's obligation, upon request by the Bank, to repurchase any and all notes or contracts in default for 90 or more days when the said Differential Account shall prove insufficient to reimburse the Bank for all principal and interest delinquent on such notes or contracts, and to the extent necessary to render said Differential Account again sufficient to reimburse the Bank for any loss on a defaulted note or contract, the repurchase price to be the full amount of unpaid and accrued interest and outstanding principal due on any note at the time of such repurchase;

(4) Performance of all of Developer's other warranties, undertakings and agreements provided for in said Note Purchase Agreement."

The developer did not merely sell defendant notes, it sold defendant numerous obligations, the breach of any of which would permit the defendant to foreclose on its first deed of trust. As such, the defendant knew, at the time it purchased the notes, that it had a claim to the property should North American fail to perform its obligations and that performance of North American's obligations under the contract for warranty deed was dependent on its tender of the warranty deeds to the purchasers. It is inconsistent for the defendant to say that it had no interest in this transaction other than as a holder in due course when it held executed deeds in one hand and a deed of trust in the other.

It is the determination of this court that defendant impliedly assumed the obligation of providing good and marketable title to

the lot purchasers or of defending such title as North American had at the time of the note purchase agreement, or at the very least of notifying plaintiffs and the members of their class that lien claims had been filed and suits to enforce those claims threatened their interests. The fact that defendant required North American to have good and marketable title—or sufficient title insurance—and at the same time obligated itself to deliver the executed deeds to the purchasers is compatible with this holding. It is of importance in this regard that defendant represented to the lot owners on several occasions that it purchased the *entire contract for deed*, not just the notes. The form letter sent to the lot purchasers with a coupon book which informed them that future payments were to be made to it stated: ". . . representing your contract which we have purchased from North American Developers, Incorporated." Also in a letter to Mr. & Mrs. Gary E. Bierman, dated December 2, 1968, the defendant stated: "We purchased this *contract for deed* from [North American] and this is the extent of our participation." (Emphasis supplied.)

■ As an assignee of North American, defendant acquired no greater rights against the debtor than the assignor had at the time of the assignment. *Centennial State Bank v. S. E. K. Constr. Co., Inc.*, 518 S.W.2d 143 (Mo.App.1974). The assignee takes the thing assigned subject to the same limitations as it had in the assignor. *St. Louis Union Trust Co. v. Hunt*, 169 S.W.2d 433 (Mo.App.1943). It is, therefore, necessary to examine the relationship of the vendor to the purchaser under a contract for deed to see if, as plaintiffs insist, defendant was acting in a fiduciary capacity or as a trustee.

■ It is well established that on the execution of a sales contract, the vendor holds legal title for the purchasers in trust and the purchasers are equitable owners of the real estate. *Jones v. Garden Park Homes Corporation*, 393 S.W.2d 501 (Mo. 1965), and cases cited therein at 505. The vendor, North American, held legal title in trust for the lot purchasers until full performance of the executory contract. The duty to convey on completed performance was assumed by the defendant on execution of the note purchase agreement and deed of trust. Being in the shoes of the vendor, defendant retained legal title as security for the unpaid purchase price. *Waugh v. Williams*, 342 Mo. 903, 119 S.W.2d 223, 227 (1938). "Although there is some authority to the contrary, the general rule is that where the vendor in an executory contract for the sale of land declares positively, prior to the time set for performance on his part, that he will not perform the contract at all, the vendee may, if he so elects, treat such anticipatory repudiation as a present total breach of the contract and immediately bring an action for the damages sustained by reason of such breach." 77 Am.Jur.2d, *Vendor & Purchaser*, § 518, at 646 (1975). In *Jones v. Garden Park Homes Corporation,* it was held that any conveyance by the vendor of any portion of the title subsequent to a contract for the sale of real estate is wrongful to the vendee and in violation of the trust. The court in *Jones* also recognized the tortious nature of a conveyance, 393 S.W.2d at 505: "[W]hen Garden Park Homes Corp. sold Lot 21 to plaintiffs on May 12, 1961, it agreed that at the designated time it would transfer the fee of Lot 21 to the plaintiffs unencumbered by a roadway easement, and that in the meantime it would hold such title in trust for the benefit of plaintiffs. Notwithstanding its agreement, and in violation of its trust, on July 29, 1961, with no actual notice to plaintiffs then or later when legal title was transferred, it purported to convey for value a portion of the title held by it to a third party. In so doing it violated its contract, and its wrongful conduct constituted a tortious act to plaintiffs' damage."

■ In the present case, defendant, as assignee of the obligations imposed on North American under the contract for warranty deed, was required to deliver good and sufficient title deed to the lot purchasers. Defendant did not do this; therefore, it was in breach of its duty. This is so

despite the fact that the mechanic's liens resulted from work done for North American. Defendant was aware that construction was under way (see the provision in the note purchase agreement relating to dam construction set out. supra) and undertook to protect its interest by requiring a title search and taking a deed of trust in the property. The defendant's failure to maintain its priority and, as a result, its inability to transfer good title, was its fault and not the fault of the lot purchasers.

Unlike the defendant in *Jones*, defendant here did not transfer the property in violation of the contract for deed. The land was encumbered with mechanic's liens and then sold because neither North American nor defendant paid off the liens. In *Jones*, 393 S.W.2d at 505, the court stated that various remedies are available to a purchaser: "As stated in 92 C.J.S. Vendor and Purchaser sec. 299, the original purchaser may treat the contract as rescinded and recover the purchase money, he may sue to recover damages for the breach of the contract, and among other available remedies, 'where the conveyance was made with intent to defraud him is an action to recover damages for the tort.'"

Although the defendant did not convey the land with intent to defraud the lot purchasers, it misled the lot owners by deliberately conveying the impression that they would receive a deed as promised on payment of the note, and failing to inform the lot owners that their equitable interest in the lots was in jeopardy.

Additionally, defendant was, in the absence of the plaintiffs, able to obtain a trial court ruling exempting nine lots, seven of which were owned by defendant, from the mechanic's lien judgments and the subsequent sheriff's sale. These lots were not recorded in the owners' names prior in time to the impression of the liens under the first spade rule and the legal basis, if any, for their exemption does not appear. Those exemptions, of course, caused a heavier burden to fall on the remaining lots which were the subject of plaintiffs' contracts for deed, and it was defendant's deceptions that contributed to plaintiffs' ignorance of the mechanic's lien case and plaintiffs' consequent inability to protect their interests in that case. After entering into the note purchase agreement with North American, the defendant sent a letter to the lot purchasers, noted supra, which provided: "We are enclosing coupon book No. . . . representing your contract which we have purchased from North American Developers, Incorporated." This language would leave any reasonable person with the belief that the contract for deed and the promissory note were purchased by defendant, as both were executed contemporaneously and both were printed on a single sheet of paper.

On November 10, 1967, in response to an inquiry of Elbert Voteau requesting assurances from the defendant, the defendant answered, "At the time that you complete payment in full on the note which we hold we will forward to you the warranty deed describing your particular lot at Monaco, and this warranty deed will be completed in both your name and your wife's name." This letter was sent over seven months after the first mechanic's lien was filed and over four months after the defendant notified North American that it had breached its agreement; yet, not one word was said concerning the mechanic's liens.

On December 18, 1969, judgment was rendered in the Highland Gardens suit; yet, on July 27, 1970, defendant's counsel wrote counsel representing two lot purchasers that their deed "is currently being held in escrow by Manchester Bank and will be delivered to the Straders [the lot purchasers] after they have completed their payments." It is evident that at this time defendant knew the lot purchasers would not get a clear title and, because their deed of trust was second to the mechanic's liens, that the only way they could keep from sustaining a loss would be to keep the lot purchasers in the dark and accept their payments for the land as if nothing had ever happened. In the same letter, the defendant, a party in the Highland Gardens suit, stated: "[I]n view of the fact that

Manchester Bank's only role in the transaction is the purchase of paper from North American Developers, Inc., our knowledge concerning the matter is somewhat limited."

An interoffice memorandum written by Burl Garrison, vice-president of Manchester Bank, on January 22, 1971, evinces the intent of the defendant to keep the lot holders in ignorance: "At a recent meeting Mr. Victor Wallace (attorney) asked me what I knew about Monaco. I pleaded ignorance as to any details. He mentioned that he has a client (a minister) who he has advised to stop payment to Manchester. He also mentioned that he has advised his client to sue Manchester for a full refund of all monies, plus aggravation, etc. He also mentioned that 2 other parties have contacted him but have not hired him to represent them as yet. There was no threat implied by Vic Wallace; just casual conversation. I did not push or pursue the conversation. This Memo is just so we keep all information shared."

The following letter dated March 22, 1972, sent by defendant's counsel to the bank's assistant vice-president, C. James Spinale, is a further example of the conduct of defendant:

"Re: Caldwell v. Manchester Bank
Cause # 1101F, Circuit Court,
City of St. Louis

"Dear Jim:

The above matter has been dismissed by the Court for failure of the plaintiff to prosecute. You will recall that this is a case where the plaintiff (who is a minister) sued the bank as a result of his purchase of a lot at Monaco Lake alleging that the note which was executed for the purchase price was a forgery and that you made certain false representations with respect to your purchase of the paper. The result of the dismissal is that the case is completed for the time being but the plaintiff would be free to refile the case if he chose to do so.

I would assume that you have an outstanding balance owing on this account but I would think that in view of all of the circumstances we should let sleeping dogs lie and not stir up the matter in any way.

If you have any questions, feel free to call."

Additionally, on September 15, 1970, 39 warranty deeds of lot purchasers, plaintiffs herein, whose notes were not fully paid at the time of recording were recorded by defendant. This was done subsequent to the judgment in the Highland Gardens case, but prior to execution. At this time defendant knew (as a party to the Highland Gardens case) that the deeds were only pieces of paper and that clear title could not be conveyed. What other reason for recording the deeds could there be than to lull the lot purchasers into believing that all was well?

Finally, on complete payment of the notes, the defendant would send to the lot purchasers letters such as the one sent to plaintiffs, Mr. and Mrs. John E. Godwin, dated May 19, 1971:

"Dear Mr. & Mrs. Godwin:

We are pleased to enclose your cancelled notes pertaining to lots # 50, # 7, # 104 and # 1 at Monaco Lake.

We are also enclosing four cards issued by the Recorder of Deeds for Jefferson County indicating that your Warranty Deeds have been placed on record as of September 15, 1970. As the card indicates, one year from that date you may, upon presentation of the cards, obtain your recorded Warranty Deeds. Therefore, may I suggest that the cards be kept in a safe place until that time."

■ The evidence of this case shows that the defendant had an interest in receiving payment on the notes even though it knew that it could not convey clear title to the lot purchasers. As trustee holding legal title in favor of the lot purchasers, defendant acted with the intent to defraud the lot purchasers. It kept them ignorant of the liens filed against their land and continued to collect on the notes despite its knowledge that the deeds were worthless. The court holds that plaintiffs are not only entitled to actual damages as a result of defendant's

failure to convey clear title but also punitive damages as a result of defendant's intent to defraud the plaintiffs. In this instance, the defendant's conduct falls within the rule enunciated in *Jones v. Garden Park Homes Corporation,* 393 S.W.2d at 505, allowing recovery in tort including punitive damages. Although the conduct in *Jones* can be distinguished from the conduct of defendant, the intent to defraud, which is the basis for the action in tort, is present in both cases.

Defendant attacks both the ability of plaintiffs to pursue their claims as a class action and the trial court's method of receiving evidence in connection with the motion for class certification. The court took account of counsel's affidavit in support of class certification and did not require that plaintiff provide other testimony in support. It then certified two classes of plaintiffs: one comprised of those who paid their notes in full, and did not receive good and merchantable title to the property, and another comprised of those "who did not pay for said note in full upon finding that they could or would not receive good and merchantable title to the real property which they purchased."

 We first examine whether this action could proceed as a class action. Rule 52.08(a)(1), requires a class so numerous that joinder is impracticable. This matter rests ultimately within the sound discretion of the trial court. *City of St. Ann v. Buschard,* 356 S.W.2d 567 (Mo.App.1962). Approximately 80 members comprised the class of plaintiffs. There were several questions of law or facts common to plaintiffs as required by Rule 52.08(a)(2). As noted supra, the crucial question of law in this suit was whether defendant owed any duty to plaintiffs other than as a purchaser of their notes. Recovery by each plaintiff depended on the existence of this duty or obligation. The record and this opinion are replete with common questions of fact. The lengthy stipulation of facts entered into by the parties which forms the basis of the factual statement in this opinion consists of common questions of fact. In brief,

each plaintiff entered into a contract for deed with North American; each plaintiff signed a note purchased by defendant; the lots each plaintiff owned were encumbered by mechanic's liens; and defendant held the executed warranty deeds on each plaintiff's lot. These are just a few of the more important facts which were common to all class members.

 Defendant asserts that the claims of the representative parties were not typical of the class. This is not so. The claims of both subclasses involved the breach of the defendant's duty which was identical with respect to both classes. The defendant failed to protect the interests of all plaintiffs which it was obligated to do. The defendant engaged in a common course of conduct with the intention of giving them a false sense of security and misleading them into believing their interests were protected—that they would receive a free and clear warranty deed.

The record and judgment of the trial court attest to the fact that the representative parties fairly and adequately protected the interest of the class as required by Rule 52.08(a)(4).

The final requisites for this class action are found in Rule 52.08(b)(3). The benefits of proceeding with a class action in this case are as obvious to this Court as they were to the trial judge. This class action amounted to a fair, efficient, and time-saving means of adjudicating the many common questions of law and fact. The individual members of the classes had no interest in controlling the litigation as long as their interests were fairly and adequately protected, as they were, nor would it have been at all beneficial for them to proceed individually against defendant. The trial court properly permitted this cause to proceed as a class action.

 Defendant contends that an evidentiary hearing was required on the class certification issue and that consideration of counsel's class action affidavit in support of plaintiffs' motion to proceed as a class was error. Defendant asserts that the affidavit was not authorized by Rule 52.08, that it

was not based on the personal knowledge of the affiant, that denial of an evidentiary hearing and consideration of the affidavit violated defendant's right to due process and equal protection of the law, and constituted a change in substantive rights, the law relating to evidence, or the oral examination of witnesses, all in violation of art. V, § 5, Mo.Const.

Shortly after filing a motion to maintain a class action, plaintiffs' attorney filed an affidavit in which he was the affiant supporting the maintenance of the suit as a class action. Defendant objected to the use of the affidavit and argued that an evidentiary hearing on the maintenance of a class action was required by Rule 52.08. After hearing argument, the court concluded that Rule 52.08 does not mandate an evidentiary hearing in every case to support a motion to maintain a class action in which witnesses are produced and testimony and evidence adduced as in a trial on the merits. The trial court did not preclude defendant from opposing plaintiffs' motion to maintain a class action "by any proper and acceptable procedural method of adducing evidence."

There is no evidence that the affidavit complained of contained facts not within the personal knowledge of the affiant. It was a result of counsel's investigation of the facts and research in the law concerning compliance with Rule 52.08. This point is overruled.

The question of whether an evidentiary hearing is required to determine the maintainability of a class action has been litigated numerous times in the federal courts and it has *never* been held to be unconstitutional in any manner. The issue has always been one of construction of Rule 23, Federal Rules of Civil Procedure, and not of the constitution. None of the federal cases cited by defendant provide *any* basis for a constitutional claim.

The following cases support the proposition that an evidentiary hearing is not required and that normally pleadings and *affidavits* will suffice to supply the data required to determine if a class action is maintainable: *Martin v. Easton Pub. Co.,*

74 F.R.D. 439 (E.D.Pa.1977); *Held v. Missouri Pac. R.R.,* 64 F.R.D. 346 (S.D.Tex. 1974); *Bleznak v. C.G.S. Scientific Corp.,* 61 F.R.D. 493 (E.D.Pa.1973); *In re Yarn Processing Patent Litigation,* 56 F.R.D. 648 (S.D.Fla.1972); *Wolfson v. Solomon,* 54 F.R.D 584 (S.D.N.Y.1972); *Berman v. Narragansett Racing Ass'n,* 48 F.R.D. 333 (D.R. I.1969). It has been recognized that the decision on whether or not an evidentiary hearing is required is a matter for the trial court's discretion and only if this discretion is abused will an appellate court reverse and require an evidentiary hearing. *Jones v. Diamond,* 519 F.2d 1090 (5th Cir. 1975).

It has been held that due process does not include the right to oral argument on motions. *Spark v. Catholic University of America,* 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975); *Morrow v. Topping,* 437 F.2d 1155 (9th Cir. 1971) (*citing Federal Communications Commission v. WJR, The Goodwill Station, Inc.,* 337 U.S. 265, 272–285, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949)). In the present case, defendant was afforded the opportunity to orally argue its case and apparently to present evidence if it wished. No counter affidavits were filed nor does it appear from the arguments in the briefs that defendant attempted to call any witnesses in opposition to plaintiffs' motion to maintain a class action.

■ Defendant supports his position that art. V, § 5, Mo.Const. was violated by citing cases holding that an affidavit may not be used as evidence absent a stipulation of parties. *See Stanfill v. Stanfill,* 505 S.W.2d 438 (Mo.App.1974); *Eames v. Eames,* 463 S.W.2d 576 (Mo.App.1971). These cases go to the merits of the suit and to the award given to the prevailing party. Neither of these issues can normally be decided without the production of evidence. (One exception is the motion for summary judgment under Rule 74.04 where the use of affidavits is permitted.) Rule 55.28, and Rule 55.31(b) before it, specifically allow the use of affidavits on motions. Defendant states that the rule is not applicable because it refers to "affidavits presented by the respective parties". The rule permits

any affidavits other than those by the individual plaintiff or defendant. It permits a party to present the affidavit of another person and is not restricted to the personal affidavit of a party.

In 3 Am.Jur.2d, *Affidavits* § 28, at 404 (1962), it is stated: "In general practice, affidavits may be used to start in motion the process of the court and are generally received as evidence upon the hearing of motions, irrespective of the vital influence the latter may have upon the final outcome of the suit."

It is also true, as the same authority, § 29, at 404, points out, that *at a trial*, because of the right to confront and cross-examine witnesses and because of the rule excluding hearsay evidence, affidavits are not admissible as independent evidence to establish facts material to the issues being tried. As the Supreme Court of Nebraska said in *State v. Howard,* 184 Neb. 461, 168 N.W.2d 370, 373 (1969): "Although affidavits may not ordinarily be used as primary evidence against the defendant, they may be used in connection with preliminary, collateral and interlocutory matters."

Rule 55.28 codifies the normal practice of deciding motions of affidavits. *See Atkins, Kroll & Co. v. Broadway Lumber Co.,* 222 Cal.App.2d 646, 35 Cal.Rptr. 385 (1963), where it was said that motions are usually made and determined on affidavits alone and former Rule 55.31 which, after listing which objections and other matters could be raised by motion, stated, "The grounds of any of the above may be supported by affidavit and controverted by opposing affidavit . . . ."

▆▆▆ It is clear that the consideration of affidavits with motions is well established in custom and usage and does not deprive a defendant of any rights guaranteed by the Missouri constitution. Defendant has mistaken the law regarding use of an affidavit supporting a motion with its use as evidence at trial. None of the allegations contained in plaintiffs' affidavit in support of the motion for a class action are established as true other than for the determination of the single issue of whether or not a class action is proper. Allegations going to the merits will necessarily be determined on evidence at the trial. The trial court's consideration of the affidavit was not inconsistent with the law relating to evidence or the oral examination of witnesses.

The trial court ruled plaintiffs' motion to maintain a class action and did not err in considering only the pleadings and affidavit without the necessity of an evidentiary hearing. Had it later appeared that the cause was not properly a class action, the court was authorized by Rule 52.08(c)(1) to alter or amend its previous order.

▆▆▆ Defendant also contends the trial court erroneously rejected the defenses of laches, statute of limitations, res judicata, and accord and satisfaction. *Jones v. Garden Park Homes Corporation,* 393 S.W.2d 501 (Mo.1965), recognized that a vendor holds legal title in trust for a purchaser. Prior to the execution sale in the *Smith* case (1970), and the *Highland Gardens* case (1973), defendant could have satisfied the encumbrances on plaintiffs' lots and delivered a clear title to the plaintiffs. The statute of limitations does not begin to run until the trust is repudiated. *St. Louis Union Trust Co. v. Hunt,* 169 S.W.2d at 442. Therefore, plaintiffs had at least until the beginning of 1975 to file their suit. It was filed on March 8, 1974, within the five year, § 516.110, and ten-year, § 516.120, RSMo 1969, period of limitations. There is no sound reason to consider the bar of laches in this case.

Defendant next raises a number of objections to the trial court's award of damages: that defendant's conduct did not justify punitive damages; that actual damages should have been based on the value of the lots at the date plaintiffs lost their title, rather than the time of trial; and that the actual damages must be awarded on the basis of the value of each lot, not the gross loss to the class.

As to the contention that defendant's conduct did not justify punitive damages, that point is ruled against defendant, for as

we have hereinabove discussed, defendant's conduct at the time the lien claims were filed, the failure to give notice thereof, its actions at that time of defeasance and its subsequent taking of monies from the lot purchasers after the land was lost, justify the imposition of punitive damages.

Defendant next contends that the damages to each class member should be computed as of the date of breach, that is, at the time of defendant's failure to warn of the lien claims which ultimately destroyed plaintiffs' opportunity to obtain title. Considering that contention, it should first be noted that in some cases a plaintiff who proves misrepresentations made by a defendant vendor as to the value of the land sold will in subsequent litigation be entitled to the "benefit" of the bargain," and the value of that which he was defrauded is measured as of the time the fraud occurred. *Smith v. Tracy,* 372 S.W.2d 925, 938–39 (Mo.1963). However, this is not a case of fraudulent misrepresentation of the value of property in which title and possession has passed to the victim but the property was of less value than that represented by the seller. Instead, in this case, the fraud completely deprived plaintiffs of the land, leaving them nothing at all. Confronted with a similar case in which the fraudfeasor represented she was the owner of certain corporate stock which in fact she did not own, but for which plaintiff paid money, this Court stated, quoting 37 C.J.S. *Fraud* § 141, at 467 (1943), "[W]here the *profits* lost through fraud can be arrived at with reasonable certainty, they may properly be recovered." (Emphasis added.) *Crawford v. Smith,* 470 S.W.2d 529, 532 (Mo. banc 1971). Concerning the damage instruction in that case, the court in *Crawford,* 470 S.W.2d at 533, quoting *Boten v. Brecklein,* 452 S.W.2d 86, 93 (Mo.1970), stated that its purpose is to "fairly compensate plaintiffs for their damages."

█ In light of the evidence on damages adduced at trial in the instant case, the most certain and equitable relief would be specific performance of the contracts for deeds, but defendant's misconduct, resulting in the loss of title by the execution sales in the mechanics' lien suits, made such relief unavailable. Unlike the plaintiff in *Crawford* who could turn to the open market to obtain other stock certificates, plaintiffs here were buying parcels of land, considered by the law as unique and properly the subject of specific performance. Were specific enforcement possible, it would of necessity be granted by judgment at the time of trial. Because it is not available, the court alternatively must grant plaintiffs the value of the land at the moment they would have received it, that is, the time of trial. This as a matter of fairness and right is necessarily so in the circumstances of this case, and the trial court merely substituted money for the land itself as a means of making plaintiffs whole. *Dunning v. Alfred H. Mayer Co.,* 483 S.W.2d 423 (Mo.App.1972) provides authority for such an award. There a developer breached his agreement with plaintiff to convey a particular lot and to build a house thereon. Plaintiff sued for specific performance but the developer during the interim had built an office building on the lot. Specific performance thus unavailable, the trial court awarded damages as of the date of trial. On appeal defendant urged that damages as of the date of breach were the proper measure. Rejecting that argument, the court stated, 483 S.W.2d at 428, "[I]n the posture of this case, Dunnings had an agreement to obtain a particular, unique lot and to have a dwelling constructed according to certain specifications . . . Under the facts and the relief sought, the Dunnings are entitled to the damages as of the time that it was adjudicated that they would not be granted the remedy of specific performance."

The same rule should apply in this tort case because no other measure would insure both certainty and the full recovery of lost profits in the situation here presented. Admittedly any attempt to assign a *future value* to each lot would involve guesswork and speculation, but such is not the case when, as here, the trial court determined the value as of the time of judgment. On the other hand, any measure of damages

utilizing a time *prior to trial* would unjustly diminish plaintiffs' relief and is not the proper measure in view of the fact that the equitable remedy of specific performance was unattainable only because of defendant's misconduct. It was that misconduct which cost plaintiffs their lost profits and those profits can and have been arrived at with "reasonable certainty." *Crawford v. Smith,* 470 S.W.2d at 532. These principles applied in *Crawford* and *Dunning* find expression in the Restatement (2d) of Torts. There, discussing remedies for torts applicable to legal or equitable proceedings in which damages are awarded for harm done, it is stated, 4 *id.* § 911, Comment k, at 478 (1979), "[A] person deprived of property may have an election to determine the time at which the value is to be fixed; and this is important in cases in which its value has fluctuated, . . ." This principle, which protects a fraud victim from loss of reasonably anticipated benefits of his bargain, applies where there has been an impairment or as here a destruction of interests in real property. As stated *id.* § 927, Comment a, at 535, "The rule also applies to a person who was wrongfully destroyed or impaired another's legal or equitable title to land . . ., as when a trustee or other fiduciary has sold the subject matter to a bona fide purchaser [See *Dunning*] thereby destroying the interest of a beneficiary," or as here when defendant's misconduct foreclosed plaintiffs' opportunity to protect their title while defendant, "letting the sleeping dog lie," continued to dun for and collect the purchase prices of the various lots. In such cases the writers conclude, *id.* § 927, Comment k, at 540–41, "The principles underlying the rule of damages for the conversion of chattels apply to situations in which the title to land has been tortiously destroyed by one who had a power but not a privilege of conveyance, . . . Thus if subsequent to the tortious . . . disposition of land, its market value has risen, the person deprived of it is entitled at his election to its highest exchange value within a reasonable time after he discovers the facts . . . ." Here, under the substantial evidence adduced, the court correctly measured damages at the time of trial.

Notwithstanding defendant's contention that the trial court erred in its computation of actual damages and its allowance of punitive damages, we find such computations and award correct except as to certain members of the class which we now discuss. In its conclusions of law the trial court stated:

"4. As to actual damages, each plaintiff and class member is entitled to such sum of money as shown by the evidence to represent the present value of the lot or lots each would have had were it not for the defendant's breach of its fiduciary duty, which amounts to Four Hundred Ninety-one Thousand Eight Hundred Ninety-two and 00/100 Dollars ($491,892.00) less a pro rata share of attorneys' fees.

\* \* \* \* \* \*

"6. Because of the legal malice of the defendant, the class is entitled to punitive damages in the amount of Seven Hundred Thirty-seven Thousand Eight Hundred Thirty-eight and 00/100 Dollars ($737,838.00), less attorneys' fees as set forth below, which net amount of punitive damages shall be apportioned among class members in such ratio as the money paid for lots bears to the total amount of money paid for all of the lots purchased by plaintiffs and class members."

The trial court had before it substantial evidence demonstrating that the value of many of the lots then held by the purchaser at the execution sale had doubled between the date the various plaintiffs entered into their contracts for a deed and the date of trial and it properly employed such values to determine the actual damages to the members of the class holding contracts as to such lots. The court also had evidence that other of the lots belonging to members of the class, title to which had been lost at the lien judgment execution sale, had been resold by the execution judgment purchaser within a year before the trial. The trial court correctly looked to the recent sale prices of such lots as the fair market value at the time of trial to determine the actual

damages for the members of the class holding contracts for deed for such lots. By simply totaling these figures, a lump sum was calculated for the award of actual damages.

 The evidence supported the trial court's mode of valuation and assessment of damages; however, we believe the case must be remanded to correct (among other things) the form of the award. While the lump sum may have proved useful as a means for calculating attorneys' fees, the proof was such that the judgment should have reflected the amount each individual plaintiff was entitled to receive within the class. This form of judgment is appropriate where, as here, the individual damages have been determined by the trial court and served as the basis for calculating and arriving at the total award. Although other cases have often presented different policies served by the award of damages and a wide array of complicated proof problems making most difficult the task of calculating damages, here the court should specify individual awards because the purpose is to make individuals whole for their losses and the calculation has in effect been accomplished by the trial court. *See Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 258–63 (5th Cir. 1974), *appeal after remand* 576 F.2d 1157, 1210–13 (5th Cir. 1978), *cert.*

*denied* —— U.S. ——, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Rodriguez v. Taylor,* 569 F.2d 1231 (3d Cir. 1977); *Bing v. Roadway Express, Inc.,* 485 F.2d 441, 452–55 (5th Cir. 1973). *See generally Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1516–23 (1976).

 Additionally, the court's judgment apparently included damages for the present owners of the nine lots which were excluded from the Highland Gardens mechanics' liens judgment previously discussed in this opinion. In this the court erred because these plaintiffs do not qualify as members of the classes as defined in the order certifying this as a class action and should have been dismissed therefrom. On remand the court should enter an order of dismissal as to these unauthentic class members.

 Next, the judgment included an award of damages for the claimed losses of at least thirteen holders of contract who had at some time defaulted on their obligations to pay. From the record we are unable to determine whether these plaintiffs defaulted before or after the Highland Gardens hearing. If default occurred before and forfeiture effected they cannot prevail here.[1] On the other hand, if default oc-

---

1. An exception to the general rule described above must be made in the cases of plaintiffs Groll and Massey, against whom default judgments were purportedly taken. Plaintiff Groll was sued for his default early in 1968, several months before the Highland Gardens hearing. The record before this Court reveals that Groll's attorney moved to set aside the default on April 11, 1968. On April 12, 1968, Manchester Bank sent the following letter of instructions to its attorney: "In line with our telephone conversation today, we have agreed with Mrs. Groll that so long as she honors her agreement to pay the note of Ronald Groll, we will not finalize our judgment against her son Ronald. Will you please have this case continued for a minimum of ninety days to allow Mrs. Groll to establish her ability and willingness to keep her agreement." Thereafter Groll's mother continued to send regular payments until the account was paid in full, as acknowledged by the bank by letter to her of June 2, 1972. On that date she was sent a recording card to be presented to the Recorder in Jefferson County to obtain a warranty deed, which by that time

was as worthless as all other North American deeds involved in this case.

Plaintiff Massey was sued in mid-1968 and a default judgment was obtained August 7, 1968, just nineteen days before the hearing in the Highland Gardens case. When execution on the judgment was initiated, plaintiff Massey quickly acted, for in a letter to its attorney on September 18, 1968, the bank stated, "This will be your authorization to dismiss as against the above defendant . . . . This account has been paid in full." A partial deed of release from the North American deed of trust was filed with the Recorder of Deeds of Jefferson County on September 23, 1968, but we do not find in the record before us any indication that a warranty deed was ever executed and delivered for plaintiff Massey's lot.

Defendant has asserted the defense of res judicata with respect to these two plaintiffs. The issue in the default judgments was whether the installments had been paid as required by the notes. The cause of action in the present suit is completely different in that it is

curred after these plaintiffs found "that they could or would not receive good and merchantable title," then they belong to the second class of plaintiffs described in the order certifying the class and may receive recompense for their damages. However, their damages, based on the value of the property at the time of trial, must be reduced by the amount of the balance due if any on their separate contracts which they would otherwise have paid to obtain the property.

█ Since punitive damages were calculated on the basis of the lump sum of actual damages, these directions will necessitate a recalculation of the punitive damages as well as actual damages. Punitive damages were assessed on the basis of a multiple of one and one-half times actual damages. Appellant does not contest this formula for punitive damages, and under the facts here it is reasonable. *Schmidt v. Central Hardware Co.*, 516 S.W.2d 556 (Mo.App.1974). On remand, the court should apply this formula for punitive damages and assess such damages as to each plaintiff for whom judgment is entered.

The court below also awarded attorneys' fees as a percentage of the total actual and punitive damages. On remand, of course, the attorneys' fees will be recalculated on the basis of the damages awarded and the award to each plaintiff for whom judgment is entered will be accordingly reduced by that percentage.

The judgment of the circuit court is reversed as to those members of the class whose nine lots were exempted from the judgment and execution in the Highland Gardens case. From the record before this Court, which includes as exhibits the transcript of the Highland Gardens case and a list of plaintiffs with the lots they attempted to purchase, these are Anthony J. and Rose Mary Figge, John E. and Tavy Godwin (as to lot 57 in section one only), LeRoy E. and Helen I. Haupt, Zene and Barbara Helderman, Glen A. & Ruth E. Mangam, and Donald F. and Mary Sue Turner. By reason of the exemption these persons did not lose title in the Highland Gardens proceedings. Therefore they do not belong either to the class of those who paid in full without receiving title or to the class of those who failed to pay in full until finding title to their lots was not to be had, as these classes were defined before trial. As to these plaintiffs the court should enter an order of dismissal.

The judgment of the circuit court is also reversed as to all members of the class who defaulted on their notes prior to August 26, 1968, the date of the Highland Gardens hearing, and against whom a forfeiture was effected under the terms of their contracts for deeds unless they rectified their default so as to avoid forfeiture and thereby restored their eligibility to obtain title. The record before this Court does not enable us to identify these persons nor determine their status with certainty; therefore, the trial court should make this determination on remand and enter its judgment accordingly.

As to all other plaintiffs, the circuit court's findings of fact and conclusions of law are supported by substantial evidence, *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), and the judgment is vacated and the cause remanded solely for the entry of individual judgments as follows: actual damages will be assessed in accordance with the unrebutted testimony of plaintiffs' expert witness and with the values listed on plaintiffs' exhibit number 19; punitive damages

---

based on the defendant's assumption of North American's obligations under the contract for deed and defendant's duty to plaintiffs as the purchaser of plaintiffs' contracts with North American. The defense of res judicata is inapplicable in regard to the two default judgments because the cause of action differs. *Woodford v. Illinois Central Gulf R.R.*, 518 S.W.2d 712 (Mo.App.1974).

Defendant also asserts the defenses of res judicata and accord and satisfaction against plaintiffs DeStefani with whom it settled an action on their note. The record before us does not disclose the terms of the settlement and therefore we cannot determine whether that settlement resolved the subject matter of this suit. The trial court must consider this on remand and enter proper judgment accordingly.

will be computed as the multiple of one and one-half times actual damages specified in the trial court's findings, and the percentage of attorneys' fees ordered by the court will then be subtracted from these amounts. Any amounts yet due on the notes of any otherwise eligible plaintiff will be subtracted as a setoff. The cause is remanded for entry of judgment and further proceedings not inconsistent with the views herein expressed.

MORGAN, C. J., and BARDGETT, RENDLEN, SEILER and SIMEONE, JJ., concur.

DONNELLY, J., dissents in separate dissenting opinion filed.

FINCH, Senior Judge, dissents and concurs in separate dissenting opinion of DONNELLY, J.

WELLIVER, J., not participating because not a member of the court when cause was submitted.

DONNELLY, Judge, dissenting.

This situation involves a mortgage-financing arrangement wherein Manchester Bank purchased all of plaintiffs' notes with North American, several months after their creation, under an agreement which provided the Bank with security in regard to the quasi-loan via a deed of trust on the entire property owned by North American. Manchester Bank thus stood as a mortgagee as to North American, with a deed of trust and blank warranty deeds as security, and as a holder of the notes as to plaintiffs, with the land-sale contracts and blank warranty deeds as security.

The principal opinion concedes that Manchester Bank did not specifically assume the obligations of North American under its Note Purchase Agreement, but finds that the Bank impliedly assumed North American's obligations. I believe that Manchester Bank did not impliedly assume any obligations to plaintiffs. Manchester Bank's interest in North American's solvency and the performance of its obligations went only so far as necessary to insure the stability of its position as a mortgagee. Manchester Bank did not step into the shoes of North American in regard to the developer's relationship with plaintiffs, and did not obligate itself to satisfy liens filed against the property once North American became unable to satisfy its obligations and maintain clear title to the development.

Manchester Bank's retaining the landsale contracts and warranty deeds for security is comparable to the taking by a holder in due course of both a note and security agreement for personal property. Manchester Bank could insert its name in a deed upon a purchaser's default and thus retain the property. However, this situation is due to the unique quality of a landsale contract and not to the Bank's assuming more than a holder's interest in this transaction. Manchester Bank's letters to purchasers informing them that it had purchased both their notes and the accompanying contracts likewise are not indicative of an assumption of North American's obligations to the plaintiffs, but were intended only to inform plaintiffs to whom they were to direct their payments and why.

The principal opinion speaks of the cause of action in this case as "the intent to defraud, which is the basis for the action in tort * * *."

In 4 Restatement, Law of Torts, Second, § 871 reads as follows:

"One who intentionally deprives another of his legally protected property interest or causes injury to the interest is subject to liability to the other if his conduct is generally culpable and not justifiable under the circumstances."

In 4 Restatement, Law of Torts, Second, § 890 reads as follows:

"One who otherwise would be liable for a tort is not liable if he acts in pursuance of and within the limits of a privilege of his own or of a privilege of another that was properly delegated to him."

I would not impose liability in tort on Manchester Bank in this case. The conduct of the Bank is not culpable and is justifiable under the circumstances. The Bank at all

times acted "in pursuance of and within the limits of a privilege of [its] own." The principal opinion relies on the holding in *Jones v. Garden Park Homes Corporation,* 393 S.W.2d 501 (Mo.1965), and then concedes that "the conduct in *Jones* can be distinguished from the conduct of defendant \* \* \*." I believe the principal opinion creates a cause of action where none exists. It invents a new cause of action heretofore outside the legal concepts of suable tortious conduct.

The implications of imposing a duty to plaintiffs on the Bank under the circumstances here presented demonstrate that such holding is inappropriate. Aside from the fact that the nature of such duty has been identified only obliquely, if at all, by the principal opinion, it places the Bank in an impossible position. The Bank, as a creditor of both North American and plaintiffs and the holder of a security interest which clouds plaintiffs' title, necessarily occupies a position adverse to plaintiffs. How, then, can the Bank be expected to render fiduciary obligations to plaintiffs and at the same time protect effectively its own interest in the property? The potential impact of today's holding on financing of future development in Missouri is indeed alarming.

Even if liability for compensatory damages is conceded, which I do not, I must even more vigorously dissent from the imposition of punitive damages in this case as unwarranted by the facts and by any opinion of this Court. The principal opinion imposes tort liability for compensatory damages on the basis of an *implied* assumption of contractual obligations by Manchester Bank. From this premise, the principal opinion then imposes liability for *punitive damages* on the basis of fraudulent intent. It has long been the rule in this state that at least legal malice is required for the imposition of punitive damages. Comment, 42 Mo.L.Rev. 593, 598–600 (1977). As stated in *Beggs v. Universal C.I.T. Corporation,* 409 S.W.2d 719, 722 (Mo.1966):

"The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally and without just cause or excuse. 'This means that defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive.' \* \* \*."

Throughout the transactions in this case, Manchester Bank took the position that it was entitled to payment regardless of the status of plaintiffs' titles due to North American's downfall financially. Believing they were legally entitled to payment regardless of failure of consideration, Manchester Bank made no false misrepresentations to plaintiffs by directing them to continue their payments to the Bank in return for the Bank's transmittal of the warranty deeds when payments were completed.

The principal opinion would obligate the Bank to have given legal advice to the plaintiffs on the status of plaintiffs' warranty deeds and on their obligations to the Bank, a position in which the Bank clearly should not be placed. As we recognized in *Pollock v. Brown,* 569 S.W.2d 724, 733 (Mo. Banc 1978), a good faith mistake as to the legality of an act has been held to negate legal malice. *See also Booth v. Quality Dairy Co.,* 393 S.W.2d 845 (Mo.App.1965); Comment, 42 Mo.L.Rev. 593 (1977). Surely it must be conceded that the liability imposed by the principal opinion, if such is to be the state of the law, is at least a fundamental change in the area of mortgages and financing. The Bank should not be held liable for punitive damages for intentionally defrauding plaintiffs when the Bank's obligation to convey good title to plaintiffs could not be foreseen prior to the issuance of the principal opinion.

I respectfully dissent.